UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

DIGS NYC LLC, EVANTHIA a/k/a "EVA"
RAJWANS, and BHUPINDAR a/ka/a "BHINDA"
RAJWANS,

                                Plaintiff,

                -against-

G.M. MADONNA & CO., LLC f/k/a DIGS MODA
GROUP, LLC f/k/a DIGS MODA LLC,
MADONNA & CO., LLC f/k/a DIGS MODA
SOHO LLC, MADONNAANDCO.COM, LLC
f/k/a DIGS MODA.COM LLC, and GERALYNN
MADONNA,

                            Defendants.

-------------------------------------------------------------- x

No. 14 Civ. 0538 (PAC)

**DECLARATION OF
GERALYNN MADONNA**

GERALYNN MADONNA hereby declares as follows:

1.      I am the individual defendant name herein and also the sole member of defendants G.M. Madonna & Co., LLC f/k/a DIGS Moda Group, LLC f/k/a DIGS Moda LLC (the "Company"); Madonna & Co., LLC f/k/a DIGS Moda Soho LLC ("DIGS Moda Soho" or "Madonna & Co."); Madonnaandco.com LLC f/k/a DIGS Moda.com LLC (together, "Defendants"). I respectfully submit this declaration in opposition to the motion of plaintiffs DIGS NYC LLC ("DIGS"); Evanthais "Eva" Rajwans ("Eva"); and Bhupindar "Bhinda" Rajwans ("Bhinda"; together, "Plaintiffs") for a preliminary injunction.

2.      Plaintiffs' application for a preliminary injunction should be denied for the simple reason that Defendants do not use and have no intention of using any of the marks allegedly owned by Plaintiffs', including "DIGS", "Royal DIGS", "DIGS Couture", "Vintage DIGS", "DIGS Bijoux", "DIGS Clean", "DIGS Beaute", and "DIGS Luxury Beach" (together, the "Purported Marks").

3.      After a thorough review of Plaintiffs' voluminous submission, it appears that the only allegation of current infringement relates to: (1) a conclusory allegation that the Purported Marks are being used in meta tags and source code on the Defendants' website (which, as set forth herein below is categorically false); and (2) a very limited number of third-party websites (over which Defendants have no control but have used and continue to use their best efforts to resolve, as set forth herein below) that contain minimal mistaken business information for Defendants.

4.      Although named individually in this action, I am the sole member of the three defendant entities.

5.      Plaintiffs brought this lawsuit and this motion on the heels of a business divorce between me, on the one hand, and Eva and Bhinda, on the other hand. I was both shocked and surprised to learn of this lawsuit and of Plaintiffs' motion because, since our "divorce" was "finalized" in September 2013, and although our attorneys exchanged some correspondence concerning most of Plaintiffs' allegations in their Complaint and their motion, I have not heard from them, directly or through counsel, since late November 2013. During the months since I took over all of the defendant entities, apart from a transition period which was negotiated as part of our separation, I have used my best efforts and all best practices to disassociate myself and my new brand from anything relating to Plaintiffs, including the Purported Marks.

**Background**

6.      I have spent approximately thirty-plus years in corporate fashion. I started my career in fashion as an assistant buyer in 1978, and after a long and successful career, in 2003, I ultimately became the CEO of Spiegel Brands, which conducted the business of the women's fashion retail clothing brands Speigel, Newport News, and Shape Fx (the "Speigel Brands").

7.      I therefore have substantial experience retailing women's clothing in a multi-channel environment, including print, e-commerce, and brick and mortar retail.

8.      Beginning in or about 2007, while CEO of the Speigel Brands, I became acquainted with Eva and Bhinda when I was a customer of Plaintiffs' boutique clothing store, DIGS, first shopping at DIGS' store at 1079 Third Avenue, New York, and then continuing as a customer when the store moved across the street to 1054 Third Avenue, New York (the "DIGS Store").

9.      To the best of my knowledge, the DIGS Store is the one and only retail store that Eva, Bhinda and/or DIGS has operated since 2006, with the exception of our business venture.

10.      DIGS promoted and sold women's clothes that it marketed as DIGS at the DIGS Store (the "DIGS Brand").

11.      In paragraph 11 of Eva's Affidavit, sworn to on March 11, 2014 ("Eva's Affidavit"), Eva states that DIGS launched an e-commerce site in November 2007. To the best of my knowledge, at the time that I entered into a business relationship in 2011 with Eva and Bhinda, DIGS' website consisted of one page and did not allow for the purchase of any goods through the site.

12.      While a customer of DIGS, Eva and Bhinda, represented to me that Eva was a designer, and designed many, if not most, of the clothes for sale in the DIGS Store. I later discovered that this was false.

13.      Beginning in or about April 2011, Eva, Bhinda and I engaged in discussions about the idea of creating a business endeavor to further develop and expand the DIGS Brand, including opening a second store and starting an e-commerce site. It was an opportune time for me to engage in what seemed to be an interesting endeavor.

3

14.     In paragraph 38 of her Affidavit, Eva states that "[I] lied about voluntarily leaving Spiegel, and in fact, had been forced to resign from Spiegel as a result of the fact that Spiegel's parent company … was in the process of filing for bankruptcy." This statement is categorically false. In early March 2011, I resigned from Speigel. When I resigned, I gave three months notice. Speigel found my successor prior to the end of my three month notice period, so my last day at Speigel was April 29, 2011. Upon information and belief, subsequent to my departure, in or about June 2011, the owners of Speigel entered Chapter 11 bankruptcy protection. At the time that I resigned, I knew nothing about Speigel's bankruptcy plans.

### Eva, Bhinda and I Form the Company for the Purpose of Expanding, Developing and Growing the DIGS Brand Beyond the DIGS Store and Developing an E-Commerce Presence

15.     On or about September 6, 2011, Eva, Bhinda and I formed the Company which owns DIGS Moda Soho and DIGS Moda.Com LLC, both of which were formed contemporaneously with the Company. In other words, the Company is the sole member of DIGS Moda Soho and DIGS Moda.Com LLC (together, the "DIGS Moda Entities"). The DIGS Moda Entities were formed primarily for the purpose of operating a new store located in Soho (the "DIGS Soho Store"), the new DIGS website, and further generally developing the DIGS Brands.[1]

16.     In or about December 2011, the DIGS Soho Store opened.  The DIGS Soho Store became commonly known amongst Eva, Bhinda and me, as well as the general public, as "DIGS Soho", "DIGS Moda", and "DIGS Moda Soho". In fact, we often advertised the DIGS Soho Store as "DIGS Moda" and "DIGS Moda Soho".

17.     The only relevant operating agreement concerning the DIGS Moda Entities is that

---

[1] The DIGS Moda Entities still exist and are the defendant entities named herein. As explained herein below, I changed the names to their current names as set forth in the caption of this lawsuit.

of the Company (the parent company to the other defendant entities), which was effective as of September 6, 2011 (the "Operating Agreement"). Pursuant to the Operating Agreement, I owned 50% membership interest and Eva and Bhinda jointly owned the remaining 50% interest. A copy of the Operating Agreement is attached to Eva's Affidavit as Exhibit D.

18.     Among other things, the Operating Agreement provides that (i) as partial consideration for Eva's and Bhinda's membership units, Eva, Bhinda and DIGS granted a license to the Company to use the following trademarks: "DIGS", Royal DIGS", "Vintage DIGS", "DIGS Couture", and "DIGS Bijoux" (as defined therein, the "Trademarks"); and (ii) "any newly created Intellectual Property Rights in furtherance of the Company Business [as defined therein], whether a derivative work of the Trademarks and Domain Names or otherwise, shall be the sole property of the Company unless otherwise set forth in a signed writing by and among of [sic] the Members and the Company." See Eva's Affidavit, Exh. D at §§ 2.2.2 and 2.8.

19.     As consideration for my interest, I made an initial capital contribution to the Company in the amount of $40,000. Additionally, pursuant to and in connection with executing the Operating Agreement, I loaned the Company $400,000 under certain conditions set forth in the Operating Agreement and certain loan documents (defined in the Operating Agreement as the "Initial Geralynn Loan") and an additional $110,000 (defined in the Operating Agreement as the "Geralynn Secondary Loans"). The Geralynn Secondary Loans were used by the Company to compensate Eva and Bhinda in the amount of $110,000. This $110,000 payment to Eva and Bhinda was in the form of a loan from the Company that would be forgiven in certain percentages if the Company continued to do business after certain dates, with the final forgiveness of the total amount in or about March 2013 if the Company continued to do business at that time. None of the loans that I have made to the Company from my endeavor with Eva and

Bhinda have been repaid.

### Ongoing Disagreements Between Me and Eva/Bhinda
### Resulted in My Sole Ownership of the DIGS Moda Entities

20.     Soon after the DIGS Moda Entities began business, my relationship with Eva and Bhinda became increasingly contentious. For starters, I learned that, despite her prior representations to me that she designed much of the clothing sold at the DIGS Store, Eva did not design any clothing, as all of the products were bought from wholesalers. Bhinda and Eva also refused to actively participate in any new strategy to improve the existing operation.

21.     As a result, the store was not breaking even, and both my $400,000 Initial Geralynn Loan and my $110,000 Geralynn Secondary Loans were soon in default. To this day, no amount of these loan has been repaid.

22.     Despite the Company owing me repayment on my loans which were significantly in default, Eva and Bhinda reaped what little benefits they could from Defendants, such as obtaining health insurance at my sole expense for one year and actively benefiting Plaintiffs' DIGS store at the expense of the Company. For example, Eva and Bhinda stole merchandise from the DIGS Soho Store to sell at their DIGS Store. They both repeatedly told me that they would pay the DIGS Soho Store back, but they never did. Likewise, neither Eva nor Bhinda repaid me for the year of health premiums that they promised to repay to me.

23.     Soon, Eva and Bhinda began to effectively disassociate from the operations of the Company by, among other things, giving little attention to the DIGS Soho Store or development of the DIGS brand generally for the web site or general expansion, all the while devoting significant (indeed the majority of their) time and energy to their DIGS store.

24.     When the $110,000 loan from the Company to Eva and Bhinda had been forgiven pursuant to the its terms, it became clear to me that Eva and Binda had no intent to expand or

develop the DIGS brand with me, and seemed to look at the DIGS Soho Store and the new website as merely free additional marketing for their DIGS Store, all at my expense. Eva and Bhinda seldom communicated with me and refused to physically meet with me, or, if they agreed to meet, they would then cancel. Indeed, they began to effectively freeze me out of the operations of the Company and made it so that the Company could barely function. It got so bad that Eva refused to order merchandise for the DIGS Soho Store, and when I did, she called and cancelled orders.

25.     Because it was clear that our differences were irreconcilable, and because I had lost in excess of $500,000 by going into business with Eva and Bhinda, I decided it was time to separate from them.

26.     After direct negotiation and negotiation through counsel, we ultimately entered into a Membership Transfer Agreement (the "Membership Transfer Agreement"), which was executed on September 23, 2013. The sum and substance of the Membership Transfer Agreement is that I now own all the Company as the sole member, and the Company continues to own the remainder of the defendant entities. The Membership Transfer Agreement further provided that (a) I would change the name of the DIGS Soho Store; (b) I (and the defendant entities) would be permitted to continue to use the license to the Trademarks (as defined in the Operating Agreement) through October 30, 2013 (the "Transition Period"); and (c) I (and the defendant entities) would retain but change the domain of the website that we developed for the Company.

27.     Of critical importance to Plaintiffs' Complaint and their motion, Section 1.02.2.6 of the Membership Transfer Agreement (attached as Exhibit E to Eva's Affidavit) expressly provides that the Company shall retain all of its Intellectual Property, and specifically bars

Plaintiffs' from using the Company's various names in any manner:

> The Rajwans, individually or jointly, and any entity in which the Rajwans, individually or jointly, are members, shareholders, partners, or in which either or both have any interest, or any entity affiliated with any entity in which the Rajwans, individually or jointly, have an interest, including without limitation DIGS NYC LLC, shall not use the following names in any manner whatsoever, commercial or otherwise: DIGS MODA GROUP, LLC; DIGS MODA GROUP; DIGS MODA SOHO LLC; DIGS MODA SOHO; DIGS MODA.COM LLC; and/or DIGS MODA.COM. **It is expressly understood that each of these entities shall survive and be continued without dissolution to do business as the Company deems appropriate with** ***all intellectual property rights and other rights in and to the same being retained by the Company,*** **with only the agreement to cause a name change as set forth in section 1.03.2 below.**

(Emphasis added.)

28.    The Membership Transfer Agreement further provided that "[a]ll assets and liabilities of the company shall remain the same unless specifically altered by this Agreement." Eva's Affidavit Exh. E at § 1.04.

29.    In addition, the Membership Transfer Agreement identified the "Trademarks" whose license would expire upon the termination of the Transfer Period:

> Notwithstanding anything in the Operating Agreement to the contrary, the Company's license to use the following Trademarks shall terminate at the end of the "Transition Period" as such term is defined in Section 1.03:  "DIGS", "Royal Digs", "Vintage Digs", "Digs Couture", and "Digs Bijoux". It is expressly understood and agreed among the parties that the Company may continue to use the aforementioned Trademarks at the store operated by DIGS MODA SOHO LLC and through the Domain Name digsmoda.com until the end of the Transition Period (and as set forth in 1.02.2.6 and 1.03.2).

(Eva's Affidavit, Exhibit E, Section 1.02.2.2).

**Defendants Own the Mark "DIGS Beaute"**

30.    As Eva admits in paragraph 13 of her Affidavit, the mark "DIGS Beaute" commenced on or about October 15, 2011 -- more than one month after we began the Company and the effective date of the Operating Agreement. Indeed, noticeably absent from the definition of Trademarks in the Operating Agreement is "DIGS Beaute". See Eva's Affidavit, ¶ 29

(acknowledging same).

31.    I was actively involved in the creation of the "DIGS Beaute" mark. In fact, we developed "DIGS Beaute" specifically for the DIGS Soho Store and for the new DIGS website.

32.    It always was and continues to be my understanding that "DIGS Beaute" is included as Company Intellectual Property as defined in Section 2.8 of the Operating Agreement (Exhibit D to Eva's Affidavit), meaning that it was and continues to be the property of the Company:

> Notwithstanding the aforementioned Trademarks and Domain Names License, it is expressly agreed and acknowledged by and among the Members and the Company that any newly created Intellectual Property Rights in furtherance of the Company Business, whether a derivative work of the Trademarks and Domain Names or otherwise, shall be the sole property of the Company unless otherwise set forth in a signed writing by and among the Members and the Company. "Intellectual Property Rights" shall mean all property, intellectual, industrial design and moral rights of every kind and nature, including all applications thereof, including but not limited to patents, copyrights, trademarks, service marks, trade names, trade dress, symbols, logos and designs, trade secrets, and registrations, initial applications, renewals, extensions, continuations, divisions or reissues thereof.

The Operating Agreement defines the Company's Business to include to "expand, develop, and grow the Trademarks and the Domain Names and Product beyond the Existing Store [DIGS]". See Eva Affidavit, Exh. X, Recitals.

33.    Notwithstanding that the Company clearly owns "DIGS Beaute" under the express terms of the Operating Agreement, Eva admits in paragraph 17 of her Affidavit and Exhibit B thereto that, when she registered "DIGS Beaute" with the United States Patent and Trademark Office ("USPTO"), she identified the owner as DIGS rather than the Company. As set forth below in paragraph 77, Eva, Bhinda and I agreed that they would assign ownership of "DIGS Beaute" to the Company. The Company paid the USPTO application fee for "DIGS Beaute". Apparently, Plaintiffs never assigned DIGS' ownership of this mark to DIGS Moda

Soho.

34.     In any event, because the Company clearly owns "DIGS Beaute", all rights to and in "DIGS Beaute" were retained by the Company, which now solely owned by me, under Section 1.02.2.6 of the Membership Transfer Agreement.

**Plaintiffs Breach the Membership Transfer Agreement**

35.     Notwithstanding that Defendants were permitted during the Transition Period (i.e., through October 30, 2013) to continue exercising their rights to the license to use the Trademarks, as early as October 7, 2013, Eva advised third-parties, both orally and in writing, that the DIGS Soho Store was closed.

36.     For example, on October 7, 2013, Eva wrote the following to Shoptiques, a third-party promoter with whom the Defendants did and continue to do business:

> Please confirm that you received my email below and please make sure that you remove the DIGS SOHO store off your website today to avoid any trademark infringement. This store is officially closed and Shoptiques cannot use our name without our permission. Gerallyn Madonna is no longer affiliated with us or DIGS anymore and cannot be listed as owner on your website for DIGS.

(A copy of Eva's October 7, 2013 email to Shoptiques is attached hereto as Exhibit 1).

37.     Plaintiffs' counsel advised my counsel that Eva would email a retraction, see the accompanying Declaration of Christopher J. Platt, dated March 18, 2014 (the "Platt Decl."), ¶¶ 3, 4, but, to the best of my knowledge, she never did.

38.     Likewise, despite Defendants having renamed each of the defendant entities during the Transition Period, launching its new brand as Madonna & Co., and switching the website from the domain digsmoda.com to madonnaanco.com, Plaintiffs' made every effort to hinder the Defendants' rebranding and to otherwise interfere with Defendants' business. For example, in addition to her email to Shoptiques, Eva also emailed me on October 7, 2013,

stating: "We are aware there is a transition period till the end of the month . . . everything that is DIGS related to Soho will be and must be terminated by the close date *even if you don't do it.*" (Emphasis added.) A copy of Eva's October 7, 2013 email to me is attached hereto as Exhibit 1.

39.     Defendants expended significant amounts of time and money to launch and promote the new Madonna & Co. brand. To be clear, Defendants have no desire to associate with Plaintiffs or the Purported Trademarks. Indeed, I believe that any association with them or their Purported Trademarks will only dilute the Madonna & Co. brand I have worked and continue to work very hard to develop.

**Notwithstanding that Plaintiffs are the Cause
of Any Issues They Had with the Madonna & Co. Facebook Page,
All Such Issues are Moot as They Have Been Resolved Since December 4, 2013**

40.     As part of the Membership Transfer Agreement, I changed the name of the Facebook page for the Company to Madonna & Co. Only moments following the Transition Period, on November 1, 2013, without notice to Defendants, Eva twice notified Facebook of alleged intellectual property right infringements on the Madonna & Co. page. Facebook therefore removed certain allegedly offending items. Again, on November 6, 2013, without notice to Defendants, Eva sent another similar complaint to Facebook which resulted in Defendants being locked out of the Madonna & Co. Facebook account.

41.     To the best of my understanding, it is Facebook's policy to automatically block access to an account without inquiry when complaints are made regarding claims to intellectual property.

42.     Eva's complaints to Facebook were baseless because the alleged offending content primarily related to photos posted depicting the DIGS Soho Store, and other items depicting the Purported Trademarks, all of which were posted prior to the execution of the

Membership Transfer Agreement, and to the best of my knowledge were identified as to the date of posting, and all of which remained the property of the Company (and now Madonna & Co.).

43.     Plaintiffs, through counsel, advised Defendants of further complaints concerning the Madonna & Co. Facebook page by letter Dated November 18, 2013. Eva mentions her counsel's letter in paragraph 118 of her Affidavit and attaches it as Exhibit FF thereto, but fails entirely to mention that my counsel fully responded by letter dated November 25, 2013. See Platt Decl., ¶¶ 9-14 and Exhibit 2 thereto.

44.     Among other things, Defendants' counsel advised Plaintiff's counsel that, as a result of Plaintiffs' self-serving actions in contacting Facebook rather than me, Defendants were unable to access the Madonna & Co. Facebook account and therefore had no means to remove any of the items Plaintiffs complained about. Defendant's counsel also requested that Plaintiffs assist Defendants to regain access to the Madonna & Co. Facebook account.  See Platt Decl., ¶ 11 and Exhibit 2 thereto.

45.     Plaintiffs were hostile and absolutely refused to work with me in an effort to resolve these issues. Plaintiffs did not communicate with me, and, to the best of my knowledge, Plaintiffs' counsel did not communicate substantively with Defendants' counsel following Defendants' November 25, 2013 letter.

46.     Notwithstanding Plaintiffs' refusal to assist Defendants in regaining access to the Madonna & Co. Facebook page, Defendants were ultimately successful on December 4, 2013, after several weeks of direct requests to Facebook, in regaining access to the Madonna & Co. Facebook page. On that day, even though I believed and continue to believe that I did not have to remove anything from the Facebook page based upon the express terms of the Membership Transfer Agreement, I began removing all of the requested material that remained on the

Facebook page for which Eva had complained. Attached hereto as Exhibit 2 is a copy of my email to my employees directing them as follows: "We got access back finally . . . . Corinne pls. call me so we take DOWN everything and anything that mentions DIGS . . . Thks . . . G". (Emphasis in original.)

47.     Since those items were removed, Defendants have not posted anything concerning Plaintiffs or the Purported Trademarks, including "DIGS Beaute" (which Defendants clearly own) on the Madonna & Co. Facebook page. Nor do we have any intention of doing so.

48.     Eva's Affidavit attaches, as Exhibits V and W, approximately 40 pages of computer screen captures of the Madonna & Co. Facebook page taken prior to December 4, 2013. (These appear to be exactly the same as Exhibits T and U to the Complaint.) There is nothing post-December 4, 2013 included in Eva's Affidavit or the Complaint. Nor does Eva even allege that Defendants have threatened to post on Facebook -- or anywhere -- anything concerning Plaintiffs, the Purported Trademarks, or even "DIGS Beaute" (which Defendants own).

**Plaintiffs' Claims Concerning Twitter are Moot, Notwithstanding that Plaintiffs'
Improperly Posted "Tweets" on Defendants' Twitter Account**

49.     In paragraphs 98-100 of her Affidavit, Eva claims that Defendants have maintained postings that relate to Plaintiffs. Just as Defendants' Facebook page is the former page of the Company (for the DIGS Soho Store, the web and DIGS), Defendants' twitter account is the former account of the Company (for the DIGS Soho Store, the web and DIGS) - with both remaining as Company property after the transfer. In any event, the example Eva attaches as Exhibit AA no longer appears on Defendants' Twitter account.

50.     However, it appears that Plaintiffs -- not Defendants -- have acted unlawfully with respect to Twitter. Attached hereto as Exhibit 3 is a computer picture from my computer screen

that I took on January 5, 2014 showing that the cell phone number (917) 822-0391, which I

know to be Eva's and/or Bhinda's telephone number, accessed or posted on December 27, 2013

on Defendants' Twitter account. That day, the following "tweets", a copy of which is attached

hereto as Exhibit 3, appeared on Defendants' Twitter feed: "No she's not getting any followers

just 1 a month it seems but she did get 3 unfollowers last week. LOL!!"; and "Sending you a pic

from bhindas phone".

**The Majority of the Complained of Third-Party Postings are Maintained Through One
Third-Party, Yext, and Eva's Claims About Such Postings are Moot.**

51.     One of my contributions to the Company, specifically for the Digs Soho Store and

the Digs web site (which also benefited Plaintiffs' DIGS), was developing an Internet marketing

strategy and an e-commerce site (originally digsmoda.com), which included, among other things,

listing the DIGS Soho Store and domain name (with an advertising summary where possible)

with third-party business listings.

52.     In furtherance of this Internet marketing strategy, I established and maintained an

account for the Company with Yext.com to promote the DIGS Soho Store and digsmoda.com.

Yext is a one-stop "Power Listing" source that enables businesses to input relevant information

which it shares with numerous third-party websites. The benefit to marketing through Yext is

that based upon information I provided to Yext, when an Internet user conducted a relevant

search (key words, location) on various selected third-party websites, the information for the

DIGS Soho Store and digsmoda.com would be displayed. The information that would be

displayed by those third-party websites was essentially the same, as Yext provided them with the

language and information that I had provided to Yext.

53.     Yext provides a template for requested information such as address, phone, web

address, business description, photos, etc. (the "Yext Master Listing Information"). Once I

inputted this Yext Master Listing Information for the Company, that information was shared with selected numerous third-party websites.

54.     Following the Transition Period, because Defendants maintained the Company account with Yext, I modified Defendants' Yext account to reflect the new Yext Master Listing Information for the Madonna & Co. brand. Yext currently maintains listing information on 53 third-party websites for Madonna & Co. Attached hereto as Exhibit 4 is a PDF print-out of Madonna & Co.'s account with Yext listing the 53 third-party websites that contain the Yext Master Listing Information for Madonna & Co.

55.     In paragraph 72 of Eva's Affidavit, Eva claims "Defendants have placed postings on websites throughout the Internet" and attaches as Exhibit P examples of postings that she claims to "depict[ ] false and misleading associations between its store name, on the one hand, and the Digs Masterbrand and Trademarked Lines, on the other." Eva's Exhibit P contains 37 pages of computer screen captures taken from various websites purportedly showing the alleged "false and misleading associations."

56.     Of the 37 pages in Eva's Exhibit P: (i) 2 pages are duplicates of the same computer screen capture (page 36 is a duplicate of page 1, and page 37 is a duplicate of page 2); (ii) 1 page relates to a website called Mylife (page 8), which I cannot address because I have no idea what this website is and there is no indication of any offending conduct relating to Defendants on it; and (iii) 2 pages (pages 9 and 11) have no offending conduct indicated. This leaves a total of 32 instances of alleged infringements in Exhibit P.

57.     Eva apparently identified the 32 instances of alleged offending conduct in her Exhibit P by drawing a circle around each instance. Each of these 32 screen captures were taken during the time period between November 9, 2013 (one week after the Transition Period)

through December 29, 2013, with the majority being taken on November 22, 2013. Notably, paragraph 81 of the Complaint and Exhibit N attached thereto assert similar allegations with the same screen captures, except that Exhibit N to the Complaint contains 8 less screen captures than Eva's Exhibit P. Each of the 8 "new" screen captures included in Eva's Exhibit P was taken on November 22, 2013 (Exhibit P, pages 1, 2, 32-37).

58.     In 28 of the 32 computer screen captures, Eva's hand-drawn circles show that the alleged offending conduct is the same on each third-party website. Specifically, Eva circled "(Formerly DIGS MODA SOHO)" which appears at the end of the business summary for Madonna & Co. on the screen capture for each third-party website[2]. With the exception of screen captures from two websites (Hopstop[3] and Mylife, pages 14 and 8, respectively to Exhibit P), each of these examples are from listings maintained through Yext. Notwithstanding that I believe it was and still is proper for Defendants to identify Madonna & Co. as "Formerly DIGS Moda Soho", in or about February 2014, I removed the "Formerly DIGS Moda Soho" from Yext, and therefore that phrase was removed at, or shortly after, that time from the 28 instances included in Eva's Exhibit P. A copy of Madonna & Co.'s current Yext Master Listing is attached hereto as Exhibit 5.

59.     Of the 4 remaining of the total 32 total instances of alleged infringements in Eva's Exhibit P, three are addressed as follows: (i) Page 2 (and duplicated on page 37) is a screen capture from November 22, 2013 from factual.com about which Eva claims that the content relates to DIGS rather than Madonna & Co. As identified on Exhibit 6 attached hereto, I

---

[2] Pages 1, 3, 15 and 36 (which is a duplicate of page 1) in Eva's Exhibit P all relate to the same website, Pocketly.com. Exhibit P does not identify this as an issue, but each of the print outs include a logo picture for DIGS on the listing for Madonna & Co. Pocketly is a site listing through Yext, so we are unaware why this would occur. We have contacted both Pocketly and Yext in an effort to resolve this issue.

[3] I recently performed a search on hopstop.com for Madonna & Co. and did not receive a result. I am unsure where Eva obtained the screen shot for Hopstop that she attached as part of Exhibit P to her Affidavit.

searched this listing which no longer refers to DIGS. (ii) Page 10 is a screen capture from foursquare.com about which Eva claims infringement based upon a two year old review thereon that refers to DIGS. I searched this listing, and this review is no longer visible on the site, as identified on Exhibit 7 attached hereto.  (iii) Page 12 is a screen shot from Storeboard.com. I have no idea where this came from or how to change it. In any event, I have no objection to Plaintiffs contacting storeboard.com in order to have all references to DIGS removed.

60.     Finally, with respect to the last of the remaining 4 screen captures of the total 32 instances of alleged infringements in Eva's Exhibit P, that screen capture pertains to whitepages.com. In Paragraph 77 of her Affidavit (and Exhibit U attached thereto), Eva states that Madonna & Co.'s listing on whitepags.com associated it with DIGS. Notwithstanding that whitepages.com is part of Defendants' Yext Master Listing, neither Yext nor whitepages.com has yet corrected this problem, despite my communications to both Yext and whitepages.com requesting that they do so. Indeed, Plaintiffs were advised of this issue, through counsel, by letter dated November 25, 2013. See Platt Decl., Exh. 2. In any event, I have continued to request that whitepages.com fix this issue.

61.     To be clear, as indicated above, the screen captures included in Eva's Exhibit P and the Complaint's Exhibit N are not an accurate reflection of how those pages appear today, nor how they appeared on March 11, 2014 when notice of this application was emailed to Defendants.

62.     Following receipt of Plaintiffs' counsel's March 11, 2014 email notifying me that Plaintiffs had commenced this lawsuit and were planning to make an application to this Court the next day for a temporary restraining order, I reviewed the Complaint's Exhibit N (which I later discovered after finally receiving, on March 12, 2014, Plaintiffs' papers on their motion

generally corresponds to Eva's Exhibit P as described), and printed copies of the websites identified in the Complaint's Exhibit N. Not a single one contained the alleged offending conduct of "(Formerly DIGS MODA SOHO)" that was identified in such corresponding computer screen captures submitted by Plaintiffs. Attached hereto as Exhibit 8 are printouts of the websites included in Eva's Exhibit P as they currently exist (or as they existed on March 11, 2014 for the websites identified as being printed that day, and for those websites – they are printed in PDF format and not screen capture format).

**Eva's Claims Concerning Content on City Search are Moot**

63.   In paragraph 76 of Eva's Affidavit (and Exhibit T attached thereto), Eva claims that Defendants engaged in improper conduct on newyorkcitysearch.com relating to "reviews containing references to the Soho Store as 'DIGS, Soho. . . '". Eva's claim here is misguided. The alleged offending conduct is user (consumer) generated content that was over a year old, as it was posted when the company was called DIGS Soho. More importantly, as with the vast majority of the other screen captures attached to Eva's Affidavit, this was taken on November 22, 2013. As set forth on the printout attached hereto as Exhibit 9, the posting on newyorkcitysearch.com no longer exists.

**Eva's Claims Concerning Content on Yelp!
Are Out of Defendants' Control and, In Any Event, are Moot**

64.   In paragraphs 83-89, Eva claims that Defendants have somehow violated the Membership Transfer Agreement and improperly used Plaintiffs' marks. As with all other Internet postings, including the website for the DIGS Soho Store, Madonna & Co.'s Yelp! Page was previously that of the DIGS Soho Store. Accordingly, referring to the history of the store is a natural progression and in the spirit of the Membership Transfer Agreement. It seems quite clear that the purpose of notifying Yelp! readers that the store's name changed to Madonna & Co. was

because it was no longer associated with Plaintiffs or DIGS. In any event, it is my understanding that, in conditions like this where a retail location goes through a rebranding with a different owner, Yelp! lists the entity as having been "renovated". Defendants do not have any control over Yelp!'s policies. Additionally, as identified on Exhibit 10 attached hereto, Eva's claims concerning Yelp! in paragraphs 84-86 of her Affidavit no longer exist.

### Eva's Claims Concerning Google Are Moot

65.     In paragraphs 90-97 of Eva's Affidavit, Eva claims, as she did through her counsel's November 18, 2013 letter (attached as Exhibit FF to Eva's Affidavit), that Defendants maintained improper postings on Google. As my counsel responded by letter dated November 25, 2013 (see Platt Dec., Exh. 2), I previously contacted Google Plus on October 8, 2013, November 1, 2013 and November 17, 2013, and was finally advised on November 17, 2013 that it may take as long as 30 days to process the change. My counsel further advised Plaintiffs that, "[n]otwithstanding the foregoing, it now appears that the changes have taken effect." (See Platt Dec., Exh. 2.)

66.     To the best of my knowledge, the issues Eva complains about concerning Google no longer exist, and, in fact, have not existed since late November 2013. Indeed, the date range for the computer screen captures included in Exhibits Y and Z to Eva's Affidavit is from November 7, 2013 through November 27, 2004. As with all of the other issues Eva raises, following my counsel's November 25, 2013 letter, I was never contacted by Defendants' regarding Google or any other concerns.

### Eva's Claim Concerning Yahoo Are Moot

67.     In paragraphs 101-106 of Eva's Affidavit (and Exhibit BB attached thereto), Eva claims that Defendants improperly maintained a posting on Yahoo that included the domain

name digsmoda.com. As an initial matter, since October 31, 2013, the domain name

digsmoda.com was changed to madonnandco.com. Therefore, to the extent that anyone clicked

on that link, they were redirected to Madonna & Co.'s webpage, as required by the express terms

of the Membership Transfer Agreement.

68.     In any event, as Eva admits in paragraph 106 of her Affidavit, to the extent that

there ever was any basis for her allegations (which are not clear to me), the subject listing was

removed in or about December 2013. To the extent that there is anything DIGS related that may

remain in any of the Company's old listings with Yahoo that were converted to Madonna & Co.,

I have previously requested such removal.

### Eva's Claims Concerning the Allyson Paul Pseudonym
### Appear to be a Distortion of Reality Created by Eva

69.     In paragraphs 107-110 of her Affidavit, Eva alleges, without providing any basis

whatsoever for her outrageous allegations, that Defendants are "posting on third party sites under

the pseudonym Allyson Paul". This allegation is false. Upon reviewing the screen captures

attached to Eva's Affidavit as Exhibit CC in support of her baseless and unsupported allegation, I

visited the same sites. Attached hereto as Exhibit 11 are printouts of the sites that I visited. The

first post Eva complains about appears to be from 2012. As for that post and the other two, I

have no idea what these relate to or who Allyson Paul may be, if anyone.

### During and Shortly After the Transition Period, Defendants Properly
### Identified Madonna & Co. as "Formerly DIGS Soho"

70.     In paragraphs 111-113 of her Affidavit, Eva states that Defendants "have been

forwarding email communication to Plaintiffs' clients identifying the Soho Store as being

'formerly DIGS Soho'". Eva's allegations infer that there is some wrongful communication with

"Plaintiffs' clients".  By the clear terms of the Membership Transfer Agreement, the Company

retained all of its assets and liabilities. See Exhibit E to Eva's Affidavit §§ 1.02.2.6, 1.04. One of

the very few assets this Company had at the time of the Membership Transfer Agreement was its

customer list. It is incomprehensible that Eva would assert that Madonna & Co. had no right to

email its own customer list. In addition, it is quite customary upon changing the name and the

brand of a company for that company to email and otherwise communicate this information with

its customer base.

71.      Leaving aside that there was nothing improper about identifying Madonna & Co.

as "formerly DIGS Soho", the only email Eva identifies is one to eseigel@nyc.rr.com, which

email address apparently belongs to Estelle Seigel who is the only non-party who submitted an

affidavit in support of Plaintiffs' motion. That email (attached to Eva's Affidavit as Exhibit DD)

was sent on October 23, 2013 -- during the Transition Period when Defendants still had a full

license to use the Purported Trademarks.

72.      In any event, Madonna & Co. sent emails that identified it as "formerly DIGS

Soho" for approximately one month while launching its new brand. Defendants have no intention

of further identifying Madonna & Co. as ever having had any relationship with Plaintiffs, the

Purported Trademarks, or even "DIGS Beaute" which Defendants clearly own.

**Eva's Claims that Defendants Have Copied Plaintiffs' Designs Are Baseless Because I
Never knew Plaintiffs to Design the Clothes They Sell at Their DIGS Store**

73.      In paragraph 114 of Eva's Affidavit, Eva claims that "it has become apparent that

Defendants have expanded the nature of its [sic] infringing activities and are now copying

Plaintiffs' designs" and attaches, as Exhibit EE, printouts from Plaintiffs' website and Madonna

& Co.'s website showing a similar metallic cardigan.

74.      In or about fall 2013, I selected the sweater depicted on Madonna & Co.'s website

in Exhibit EE to Eva's Affidavit from a wholesale vendor at a market tradeshow. The sweater is

for resale at retail through Madonna & Co.'s website and its store in Soho. The wholesale vendor is Cecico, Inc., and a copy of the purchase receipt is attached hereto as Exhibit 12.  I suspect that Plaintiffs are in possession of a similar receipt from the same wholesale vendor.

75.     Upon information and belief, Plaintiffs did not design this sweater.[4]

76.     Although it seems completely irrelevant, I am compelled to point out that Eva is talking out of both sides of her mouth by accusing Defendants of somehow stealing Plaintiffs' design by selling the same sweater while at the same time claiming in paragraph 128 of her Affidavit that "the quality of the DIGS Brand products are clearly superior" and that "Defendants' products are cheaply made without the attention to detail which is used in making Plaintiffs' products".

### Defendants Own the "DIGSMODA" Mark and, in any Event, Do Not Intend on Pursuing the USPTO Application for Registration

77.     In paragraph 135 of her Affidavit, Eva claims that I have somehow done something improper by having filed a USPTO application for registration of the "DIGSMODA" mark. Eva's allegations in this regard are baseless. When I caused the Intent to Use application to be filed with the USPTO through an outside service, the application listed me, individually, as the owner, as Eva and Bhinda were fully aware at the time. As Eva and Bhinda also know, they consented to this arrangement, as I fully intended to assign ownership to the Company upon registration.[5] However, the mark was not registered prior to our execution of the Membership Transfer Agreement. In any event, pursuant to the express terms of the Membership Transfer Agreement, Defendants own all rights to this mark. See Eva's Affidavit, Exhibit E, Section

---

[4] Upon information and belief, Eva unlawfully obtained the photograph of the sweater on the DIGS website when she improperly took a digital file owned by DIGS Moda Group.

[5] Similarly, Plaintiff DIGS applied for trademark registrations for DIGS Clean and DIGS Beaute which were the property of the Company and which were paid for by the Company, with the intention of assigning ownership to the Company upon registration. Plaintiffs, however, never did so. Attached hereto as Exhibit 13 is an email from Bhinda to me on January 2, 2012 referencing the foregoing agreement.

1.02.2.6.

78.     Notwithstanding Defendants' ownership of this mark and that the USPTO issued a Notice of Allowance in November 2013, Defendants have done nothing further to pursue registration of this mark; nor do we intend to do so. Upon information and belief, the USPTO will deem this application to be abandoned six months following the Notice of Allowance.

### Eva's Claim Concerning the Appearance of "DIGS" In One Post-Domain Address of One Page on Defendants' Website is Moot

79.     In paragraphs 54-56 (and Exhibit G attached thereto), Eva claims that, prior to January 30, 2014, a link in the madonnaandco.com website led the Internet user to the following domain: www.madonnaandco.com/DIGS-Clothing. Eva appears to take issue with the "DIGS-Clothing" portion contained after the ".com". That portion of the URL is commonly known as the post-domain because it appears after the ".com".

80.     Immediately upon the conclusion of the Transition Period, consistent with the Membership Transfer Agreement, Defendants used the prior digsmoda.com website and converted it to madonnaandco.com. This was a significant undertaking that was performed very quickly by a third-party hired by Defendants, Worldwide Digital, LLC.

81.     Among the items I instructed Worldwide Digital, LLC to do was to remove any mention of DIGS from the website.

82.     In or about early February, I became aware for the first time that this one page on the website contained "DIGS-Clothing" in the post-domain address. Upon learning that "DIGS" appeared in a post-domain of Defendants' website, I immediately removed it. Of course, had Plaintiffs notified me in their November 18, 2013 letter to counsel or through any other means that "DIGS" appeared in a post-domain on Defendants' website, I would have immediately corrected the issue for the simple reason that I do not want Defendants to have any association

with Plaintiffs or the Purported Trademarks. A copy of a PDF printout of the entire Madonna & Co. website from March 11, 2014 is attached as Exhibit 14.

83.     In any event, as with all of Eva's other claims, her claim that Defendants' website contains a post-domain with "DIGS" in it is moot, as she admits in paragraph 64 of her Affidavit.

### Plaintiffs' Claims That Defendants Have Used the Purported Trademarks On Defendants' Website Is Moot

84.     In paragraphs 57-67 of her Affidavit, Eva claims that, after the Transition Period, and prior to January 30, 2014, there was one webpage of Defendants that included certain of the Purported Trademarks under a listing of "Collections" that was accessible through certain Internet searches. Until early February 2014, Defendants were completely unaware that the Purported Trademarks appeared anywhere on Defendants' website. As it turned out, the only way to have accessed the page containing the Purported Trademarks on Defendants' website was by conducting an Internet search which may have turned up a link to this site, or by typing the full address "madonnaandco.com/Collection". The page itself was not accessible directly through Defendants' website. Apparently, my third-party vendor had removed the Purported Trademarks from the active webpage, but had missed deleting this page from the server that contained the Purported Trademarks. In any event, as Eva admits in paragraph 64 of her Affidavit, the Trademarks no longer appear on any of Defendants' webpages.[6]

85.     Again, had Defendants ever raised these concerns to me, directly or through counsel, I would have immediately addressed them.

### Plaintiffs' Claim that Defendants Have Used or Continue to Use the TradeMarks in Meta Tags and Source Code of Defendants' Website Are Based Entirely on Speculation and Conjecture and, in Any Event, are Entirely False

---

[6] The same explanation holds true with respect to Eva's claim in paragraph 63 of her Affidavit that Defendants attempted to mislead the consumer because a web search conducted for "DIGS Bijoux" resulted in a link to a webpage on Defendants' website. The webpage, www.digsmoda.com/Swarovski-Crystal-Bracelet.html, had inadvertently not been deleted from Defendants' archives. In any event, that page no longer exists.

86.     In paragraph 64 of her Affidavit, Eva claims, without any factual support, that "Defendants have and continue to use the Subject Marks in its meta tags and source codes." This claim is categorically false. Since the conclusion of the Transition Period, Defendants at no time included any of the Trademarks in Defendants' website's meta tags or source codes. Eva appears to base her claims on Internet searches she conducted. What Eva fails to understand is that, because the madonnaandco.com website was historically the digsmoda.com website, there are organic searches based upon algorithms utilized by search engines such as Google and Yahoo attached to the website over which Defendants -- nor Plaintiffs -- have any control.

**Plaintiffs' Claims that Defendants are Somehow
Improperly Influencing Searches Through Use of Google Adwords
is Entirely False and Based on Nothing More Than Conjecture and Ignorance**

87.     In paragraphs 68-71 of her Affidavit (and Exhibit O thereto), Eva seems to claim that Defendants' purchase of Google Adwords, together with the alleged embedding of the Purported Trademarks in Defendants' website, somehow causes Defendants' website to appear near of before Plaintiffs' when certain Internet searches are conducted.

88.     It is not clear to me exactly what Plaintiffs allege here, but, as set forth above, since the Transition Period and with minor unintentional exceptions described above, none of the Purported Trademarks were or are embedded in Defendants' webpage or in meta tags or other source code. In addition, regardless of whether Defendants could use the Purported Trademarks in their Google Adwords, Defendants do not do so. I have a printout of Defendants' Google Adwords analytics showing all of the search terms included from November 1, 2013 through March 11, 2014, which shows that Defendants have not been using the Trademarks in Google Adwords, but, because this is proprietary information, I will not share this printout with Plaintiffs. At the Court's request, I would be more than happy to share this print out for an *in*

*camera* review.

89.     Despite all of the baseless noise that Plaintiffs make about search terms and the proximity of the Plaintiffs' and Defendants' webpages in resulting searches, no consumers have been confused, at least not by conducting Google searches. Attached hereto as Exhibit 15 is a copy of Defendants' Google analytics report from November 1, 2013 though March 11, 2014 showing all visitors to Defendants' website from conducting searches on Google and the search terms used to lead them to Defendants' website. The attached Google Analytics Report shows that between November 1, 2013 and March 11, 2014, there were a de minimis number of visits to Defendants' website from the organic searches involving any of the Purported Trademarks. I suspect that those visitors were the individuals involved with this lawsuit.

90.     It is incomprehensible to me that I have had to exert time and energy, in addition to substantial legal fees, to respond to all of Plaintiffs' unfounded allegations, most of which could have been resolved (to the extent that they were not previously resolved) through simple communication. For this and all of the other foregoing reasons, I respectfully request that the Court deny Plaintiffs' motion for a preliminary injunction.

91.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   March 18, 2014
New York, New York

Geralynn Madonna