```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                          Docket #14cv538
 DIGS NYC L.L.C., et al.,           : 1:14-cv-0538-PAC

                   Plaintiffs,      :

          - against -               :

 G.M. MADONNA & CO. L.L.C., et al., : New York, New York
                                          March 20, 2014
                   Defendants.      :

------------------------------------:


                      PROCEEDINGS BEFORE
                 THE HONORABLE PAUL A. CROTTY,
              UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiffs:      LAW OFFICE OF DANIEL SINGER, PLLC
                         BY:  DANIEL SINGER, ESQ.
                         245 Fifth Avenue, Suite 1902
                         New York, New York 10016
                         (212)569-7853


For the Defendants:      FINKELSTEIN PLATT, LLP
                         BY:  ROBERT FINKELSTEIN, ESQ.
                            CHRISTOPHER PLATT, ESQ.
                         11 Broadway, Suite 615
                         New York, New York 10004
                         (212) 422-7446
```

Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

<u>INDEX</u>

<u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | Re-<br><u>Direct</u> | Re-<br><u>Cross</u> |
|---|---|---|---|---|
| None | | | | |

<u>E X H I B I T S</u>

| **Exhibit<br>Number** | <u>Description</u> | <u>ID</u> | <u>In</u> | **Voir<br><u>Dire</u>** |
|---|---|---|---|---|
| None | | | | |

3

1

2          THE CLERK:   Your Honor, this is the matter of

3   Digs NYC L.L.C. versus G.M. Madonna & Co. L.L.C., docket

4   number 14cv538.   Counsel for plaintiffs, please state your

5   appearance for the record.

6          MR. DANIEL SINGER:   Daniel Singer, Law Office of

7   Daniel A. Singer, P.L.L.C. attorney for the plaintiffs.

8          HONORABLE JUDGE PAUL A. CROTTY (THE COURT):   Okay.

9   Mr. Singer.   Who's with you at the table?

10          MR. SINGER:   Is Bhupindar Rajwin and Eva Rajwin

11   (phonetic), both plaintiffs and members of the L.L.C.

12          THE CLERK:   For defendants?

13          MR. ROBERT FINKELSTEIN:   Robert Finkelstein,

14   Finkelstein Platt.

15          MR. CHRISTOPHER PLATT:   And Christopher Platt,

16   Finkelstein Platt.

17          THE COURT:   Okay.   And who's with you?

18          MR. FINKELSTEIN:   Our client Geralynn Madonna who

19   is also the sole member of each of the --

20          THE COURT:   Okay.   All right, Mr. Singer, how do

21   you want to proceed?

22          MR. SINGER:   I can take it, Your Honor, I can

23   take it from the top if you like?

24          THE COURT:   Yes, please.

25          MR. SINGER:   Okay.   Before I go and dig into the

26   facts --

1                                                                    4

2          THE COURT:   This is being recorded, so you know.

3  E don't have a court reporter here, but.

4          THE CLERK:   He can pick up the audio.  You don't

5  necessarily have to speak into the microphone.

6          MR. SINGER:   Okay.  So if I can summarize this

7  case or my review of opposition papers in a few words, it

8  would be you're right; I promise I won't do it again.

9  Unfortunately, that's not enough to deny our request for

10 relief for preliminary injunction.

11         Going back, to give a little bit of historical

12 background here.  Diggs is a clothing store owned by both

13 my clients and has been in the business since 2005 in New

14 York.  They have a very strong reputation in the New York

15 community.  They even have some celebrity clients, such as

16 Jennifer Love Hewitt shops there.

17         They have also developed a nationwide --

18         THE COURT:   They have -- who?  Who's the --

19         MR. SINGER:   Jennifer Love Hewitt, an actress.

20         THE COURT:   Oh, really?

21         MR. SINGER:   Yeah, has shopped there.  I have --

22         THE COURT:   A name unfamiliar to me, but she's

23 famous.

24         MR. SINGER:   She is an actress, yes, a television

25 actress.

26         THE COURT:   Okay.

MR. SINGER:   And there was actually an article,
as I attach as Exhibit E to my reply papers, which had a
photo of her shopping at the Digs store, the former Digs
store in Soho.

THE COURT:   And the plaintiffs and the defendants
were together for approximately two years?

MR. SINGER:   Exactly.  The brand --

THE COURT:   And then they had a business divorce.

MR. SINGER:   Yes.  The Digs brand -

THE COURT:   Now we're dealing with the untangling
of the relationship where they had various websites and
trademarks that they shared, or?

MR. SINGER:   No, I think that's where the
distinction needs to be made.  The Digs brand name and the
associated marks well-developed before the marriage took
place.  It had a very strong reputation in the New York
community, had a strong reputation nationwide for their
website.  They were selling and advertising online.

As part of the marriage, initially they were going
to share certain trademarks.  The idea was that together
they were going to build the Digs brand, if everything
worked out, and there was a licensing agreement regarding
the trademark -- the trademarks, including -- there's a
list of the marks Digs at the time.  There was a license
specifically about that.

1

2          When things start to unravel they executed a

3  membership transfer agreement.  Very simple, Your Honor,

4  the idea behind the agreement was they were going their

5  separate ways.  Miss Madonna was going to use the old Digs

6  Soho store to continue her line, which is Madonna &

7  Company, also well-advertised on the internet, and my

8  clients were going to go continue the Digs line at their

9  flagship upper eastside store, like it had been before.

10         The license clear cut had terminated, clear cut,

11  Section 1.03 of the membership transfer agreement.  They

12  couldn't --

13         THE COURT:   So what is Ms. -- what is Miss

14  Madonna doing now that cast her into liability?

15         MR. SINGER:   I'm sorry?

16         THE COURT:   Cast her into liability.

17         MR. SINGER:   Oh.

18         THE COURT:   I mean, the allegations that you make

19  are dated as of December.  You did a check that's attached

20  to your complaint, a lot of exhibits, but they all date in

21  December.  So what is the current state of affairs?  It's

22  three months --

23         MR. SINGER:   The current state --

24         THE COURT:   -- three months later.

25         MR. SINGER:   The current state of affairs is

26  quite simple.  If I may, I'll preface that by saying that -

1

2    -

3          THE COURT:    Is Miss Madonna still using the Digs

4    name?

5          MR. SINGER:    Absolutely, absolutely, and --

6          THE COURT:    How?

7          MR. SINGER:    -- attached is Exhibit C and D we

8    have referenced some sites that my clients found after

9    reviewing their materials.   That it still references that

10   have, for example the Yelp site still references them as

11   being formerly known as Digs.

12         THE COURT:    Formerly known as Prince?

13         MR. SINGER:    Sort of to speak.   But obviously,

14   Your Honor, that near association, as far as we're

15   concerned, is a clear violation of the membership agreement

16   and a clear violation of the trademark license.

17         THE COURT:    Are they still using that?   Formerly

18   known as Digs?

19         MR. SINGER:    On the Yelp site, yes, it was

20   appearing like that, yes, in which they downloaded on the

21   19th.   Here's the thing, if I may summarize in a nutshell

22   because I -- when I first got involved in this process in

23   late November I would say, approximately, there were -- and

24   I learned afterwards there were a plethora of marks

25   violations out there.

26         What appears to have happened is after we filed

8

 1   the complaint there was some changes.  And even though they

 2   claimed they didn't know about this case until I made the

 3   motion, I find that extremely hard to believe.

 4

 5        The most violating infringement as far as I am

 6   concerned was, was that embedded within the URL on their

 7   website was the Digs name.  And also, if you have their

 8   website, underneath their website was a hyperlink to

 9   collections.  If you hit on the collections, you would get

10   all the Digs trademark names.

11        Now, the result of that was twofold.  One is when

12   you entered in Digs, the name brand, Madonna shops would

13   come up first or right behind Digs, depending on the day,

14   the Google rankings.  And if you enter any of the

15   associated related terms, it would also come up as on the

16   top, which is obviously creating a huge amount of

17   confusion.

18        What appears to have happened -- I have attached

19   two screenshots here as Exhibit B -- was on -- in January

20   29th, the day I filed the complaint, it was still there.

21   January 30th it wasn't there.  So what appears to have

22   happened is after January --

23        THE COURT:  So I mean if it's there one day and

24   not there the next, what am I to do about that?  If it's

25   not the --

26        MR. SINGER:  Well, Your Honor --

1                                                                9

2              THE COURT:    I mean usually when I issue

3    injunctions it's against current conduct, not of past

4    conduct.

5              MR. SINGER:    Well, I'm going to get to the

6    current conduct right now but there is, certainly the risk

7    here is, that they will similarly put it up again.  I mean

8    they know -- it's like -- it's like the child who's been

9    caught doing a bad thing.  You know, they know we're taking

10   legal action so they pulled back.

11             THE COURT:    Well, you're in court, I mean, and if

12   they do it again maybe you'd be in a different position.

13   But they're not doing it right now.  That's --

14             MR. SINGER:    Some of them.  Some of them.  I'll

15   get to the ones that are clearly they're still doing now.

16   There has been some changes and I have to say, most of

17   those that I put in my reply papers, were because of my

18   client's own efforts.  They communicated with Facebook.

19   They communicated with Yelp.  Yelp is one that's not

20   cooperating, so that's a key one, because Yelp will not

21   cooperate with my clients, and that's what, you know, we

22   would need the cooperation of Miss Madonna as well as an

23   order from the court to get that accomplished; that's one

24   example.

25             Another example would be some of the Google

26   associations are still up there, which I've attached also

1

2   as Exhibit C.  Other ones which they claim they tried to

3   fix but haven't are on the whitepages.com.  And one which

4   they appeared to fix the day I filed the injunction was

5   called Shoptiques, which up until then, under Madonna's

6   name, they were advertising Royal Digs as one of the

7   trademark clients.

8           So I think there's a couple of problems here.  One

9   is, while there seems to be less use of the marks now then

10  there were in November and even in, perhaps in January

11  there still is some.  B, plaintiffs don't -- defendants

12  don't think they're doing anything wrong by using them,

13  even though they seem to be voluntarily, for now, agreeing

14  not to.  And C, there's still plenty of violations out

15  there that I've attached as Exhibits C and D.

16          Now, what we're most concerned about right now,

17  when it comes to their own stuff is why, when he entered

18  Digs, because this is the main reason why there was a bit

19  of a time lapse between the filing of the complaint and the

20  injunction, was that suddenly right after they filed a

21  complaint they had taken away this egregious thing of the

22  URL and embedding it, and we want to see how was that

23  affecting the searches.  Was it resolving the problem or

24  wasn't resolving the problem.

25          My client's been running searches throughout time

26  and I've attached in my injunction, a search was done on

February 15th, and still, even though Digs would taken our

URL even though there's no longer a reference to the

trademark lines in the collections hyperlink, it still

comes up before or immediately after Digs in the searches.

So logically speaking there can only be a few

explanations for this.  One is, is that they've kept it in

their Meta tags which is what they had before --

THE COURT:   They kept it?

MR. SINGER:   In their Meta tags.

THE COURT:   Oh, Meta tags.

MR. SINGER:   I'm not sure how familiar Your Honor

is with how web pages work but typically, a typical

programming style is you enter in key words in the

underlying program of the website.  So therefore, when you

do a search, so if you have Digs, Digs, Digs, Digs, as its

underlying Meta tags, when you do a search it's going to

come up at the top.  It's going to cause Google and the

other search engines to think it's related and come at the

top.

Now they claim they're not doing it, but yet, I

don't see any Meta tag.  I don't see -- they haven't

attached their Meta tags.  I don't see that.  That's number

one.

THE COURT:   Are you suggesting that when you type

in Digs in your Google search line you get access to

1

2  Madonna?

3      MR. SINGER:   Absolutely, absolutely, oftentimes

4  before Digs and that's a huge problem.  That's a huge

5  problem.  So we're perplexed as to why.  The only rational

6  explanation is, it's in the Meta tags or some other

7  manipulation is going on.  Google is a very smart program,

8  okay, it's a brilliant search engine.  There is no way if

9  it wasn't something along those lines would they not be

10  coming up before them, particularly -- and that's the

11  reason why we waited a little bit of time to test things

12  out -- particularly after they've taken out the trademark

13  hyperlink and the collections, the trademarks from the

14  collection hyperlink, and there were some other hyperlink

15  clothing, more, now more than six weeks ago, and still it's

16  coming up at the top of the searches.  That is a major

17  problem.

18      So if I can summarize, there are really two --

19  there's two major problems going on here continuing.

20  Besides the third problem, which is we're concerned they'll

21  start doing it more again.  Number one is we --

22      THE COURT:   That's no reason for an injunction if

23  they're not doing it now.  I'm not going to adjoin activity

24  that doesn't -- it's not occurring right now and on the

25  theory that it may happen again.

26      MR. SINGER:   Well, what if they put it up

1  tomorrow?  Will I come back?

2          THE COURT:   Well then you'll be back tomorrow.

3          MR. SINGER:   It comes almost --

4          THE COURT:   Well then they'll be -- there's other

5  steps but I'm telling your right now, Mr. Singer, I'm not

6  going to adjoin something that's not happening right now.

7          MR. SINGER:   Okay.  So let me just review what is

8  happening and why I think we need an injunction.  I think

9  we need an injunction for everything; we disagree here, but

10  following your logic here, let me explain to the Court what

11  definitely needs to be adjoined.

12          There definitely needs to be an injunction on the

13  use of Meta tags in their hyperlinks, okay.  There

14  definitely needs to be any kind of association with a

15  program into their website to cause it to come up ahead of

16  us.  There definitely needs to be injunction on that.  That

17  would be a clear violation of the license agreement and a

18  clear violation of my client's statutory and common-law

19  trademark rights.

20          THE COURT:   What impact is this having on you?

21          MR. SINGER:   Oh, if someone wants to get Digs

22  clothing, they enter in Digs, and Madonna comes to the top.

23  Some people might think that --

24          THE COURT:   Well, this has been going on for

25  several months, right, since the separation?  Is your

```
1                                                    14
2   dollar volume off?
3          MR. SINGER:   Yes, yes, it's off significantly.
4   It's off, I believe, 30 to 50 percent.   It's a huge amount.
5   It's been, you know, not since the separation; it's since
6   the termination since the transition period ended, which is
7   October 30th and obviously there was time here to
8   investigate.
9          THE COURT:   I mean how much of that is due -- you
10  used to have two stores; now you have one store, right?
11         MR. SINGER:   No, no, this is just talking about
12  the one store.   This is not -- this is not -- has nothing
13  to do with a two-store/one-store scenario.   So this is
14  because there is confusion regarding the mark.   People
15  perhaps were shopping at the (indiscernible) store at one
16  point, believed it was a Digs store.   Now they go back
17  online, they look for Digs, where is the address of the old
18  Digs store?   Oh, there's Madonna, oh, that used to be the
19  Digs store.   Oh, I'm going to go to Madonna's store.   They
20  go to Madonna's store instead of going to the actual Digs
21  store.   I can think of many examples how this can be
22  confusing.
23         You know, and the behavior that Miss Madonna did
24  even prior to just at the termination period was egregious.
25  I mean she said, basically sent e-mails out to all the
26  clients saying we're the former Digs store.   In other
```

words, creating the association with a Digs trademark line,

again against the agreement, okay.

The second thing is there does continue to be

violations on third-party sites.  Now we need the Court's

help for this one.  Two reasons, one is, I want Madonna to

give her best effort to take it off.  Another one, as I set

forth in my injunction, we need -- we're asking for it to

adjoin the people who are acting constant third-party

sites.

Yelp, my client has tried to the end of time to

get -- for Yelp to take out -- they're not doing it.

They're not doing it.  We need an order from this court.

White pages, too, seems to be not cooperating.  Again, I've

listed the sites in my Exhibits C and D.  I think that's

clear-cut.  I mean it should not be any references to Digs

and the Google ads.

THE COURT:  Okay.

MR. SINGER:  And the Google ads (indiscernible),

the issue with the Google ads, you know, thank you, Mr. -

the issue with the Google ads is very similar to the

website search with the -- when you go in and you search,

you type in Digs, you're getting in their Google ads and

everything.  So obviously, something is going on with

regards to how they've programmed their Google ads if it's

coming up with Digs, again, creating confusion.

1                                                                16

2              THE COURT:   All right.  Let me hear from Mr.

3   Finkelstein and Mr. Platt.  Mr. Platt?

4              MR. PLATT:   Good morning, Your Honor.  First I'd

5   like to address one procedural issue; that the plaintiffs

6   this morning served a reply that was against the court's

7   orders.  It was served yesterday at 3 p.m.

8              THE COURT:   Well, it's not against, I mean, it's

9   untimely.

10             MR. PLATT:   They have requested for an extension

11  of time that was rejected yesterday.

12             THE COURT:   Yeah, right.

13             MR. SINGER:   May I respond to that?

14             THE COURT:   No.

15             MR. PLATT:   I'd like to strike that from the

16  record, Your Honor.  We have not reviewed that yet this

17  morning; we just reviewed it now.  I don't think it adds

18  anything different to what we're discussing, but.

19             THE COURT:   Okay.  What's your next -- what's

20  your --      MR. PLATT:   What I'd like to --

21             THE COURT:   -- what's your important point?

22             MR. PLATT:   I would just like to instead of -- I

23  don't -- unless Your Honor has questions specific to the

24  background, I'd like to address what plaintiff's counsel

25  has said is happening now because it is defendant's

26  position that there is absolutely no conduct that is

1                                                                    17

2   occurring.  This is a past dispute that the parties had

3   that any issues between the parties were resolved in

4   November or December that the plaintiffs even had notice of

5   -- or the defendants had notice of.

6              THE COURT:   Well he points to Exhibits B and C or

7   C and D.  Was it B and C or C and D?

8              MR. SINGER:   C and D.

9              MR. PLATT:   C and D or what?

10             MR. SINGER:   Of the reply papers.

11             THE COURT:   Oh, well, okay.  I thought it was C

12  and D of your papers.

13             MR. SINGER:   May I say one thing, please, just

14  quick?

15             THE COURT:   Yeah, yeah.

16             MR. SINGER:   I mean that's -- I could not have

17  had -- I needed the opportunity to review what they have

18  done in their opposition to get to see it.

19             THE COURT:   Listen.  You -- wait a minute, no,

20  wait am minute, Mr. Singer.  You've sought an order to show

21  cause, right?

22             MR. SINGER:   That's correct.

23             THE COURT:   I granted the order to show cause.  I

24  put in time for the response.  It was a short time for the

25  defendants to respond, and you got a short time, too,

26  because you wanted to -- brought this on quickly.  You want

18

 1

 2  a preliminary injunction.  Then for you to give yourself an

 3  extension is really not an appropriate conduct.

 4          MR. SINGER:  I set forth my reasons in my papers

 5  as well as a letter.

 6          THE COURT:  And I set forth just as promptly my

 7  reasons for denying and it should've been in last night by

 8  the close of business.  It's not fair, it's not right to

 9  give us filed papers.  We got them at -- what time did we

10  get them, ten-thirty this morning?

11          THE CLERK:  Ten-seventeen, Your Honor.

12          THE COURT:  Ten-seventeen.  We're not speed-

13  readers, you know.  You're not the only case that we have.

14  I'm not paying any attention to the reply papers.  Go

15  ahead.

16          MR. PLATT:  Your Honor, so as I said, the

17  majority of almost all of the allegations in the papers

18  submitted with the order to show cause did not exist at the

19  time that the preliminary junction was sought.  They do not

20  exist now and they do not -- there's no threat that they

21  will exist.

22          THE COURT:  Now what about the formerly know as -

23  -

24          MR. PLATT:  That -- the formerly known as Digs

25  Moda Soho was set forth in e-mail in -- by plaintiff's own

26  papers with their submission in October of 2013 and that

19

1  was during the transition period where the defendants had a

2  license to continue to use the purported marks for that

3  month while the new brand started.

4       All it was, was the assets of the company remain

5  the same, when one of which was the customer list, and that

6  was nothing more than the defendants e-mailing their

7  customer list and saying that what was formerly Digs Moda

8  Soho is changing to Madonna & Company.  I can't imagine any

9  joining of the marks or any use of the marks.  This is --

10 and they had an absolute license to use it at that time.

11      THE COURT:   Is Madonna still using any reference

12 to Digs?

13      MR. PLATT:   Absolutely not.  The only allegation

14 the plaintiffs have raised is this wild baseless allegation

15 regarding Meta tags.  We have a declaration from the

16 defendant's third party web consultant who helped change

17 the website.

18      THE COURT:   That's Mr. Straub's --

19      MR. PLATT:   Mr. Straub, yes.  What happened with

20 the website was that one of the assets of the company that

21 remained with the defendants was digsmoda.com.  That was

22 changed to madonnaandco.com.  This third-party consultant

23 was hired to assist with that and as he said in his

24 declaration, one of his jobs was to wash anything relating

25 to Digs from the website.

1                                                                    20

2              All they've alleged was that on two separate pages

3    that were not even linked to the website, they were

4    accessible only on the server, were actually missed.  There

5    was no way to get to those websites --

6              THE COURT:   Were mixed or missed?

7              MR. PLATT:   Were missed, I'm sorry, Your Honor,

8    they were missed by this third-party consultant as he said

9    in his declaration.  There was no notice provided, although

10   plaintiffs apparently knew about this, there was no notice

11   provided to defendants regarding this.  And as soon as

12   defendants became aware of this they removed those two

13   things that were missed during the web transfer.

14             THE COURT:   And when did that happen?

15             MR. PLATT:   That was in, I believe January, early

16   February 2013 -- or '14, I'm sorry.

17             THE COURT:   No, if I put in -- if I put in Digs

18   in Yelp, white pages or Google?

19             MR. PLATT:   That's a separate issue, Your Honor.

20   That's the third party.  Right now and in the past --

21             THE COURT:   Right now, yes.

22             MR. PLATT:   -- with I believe potentially white

23   pages and I think there might be one other, it might show

24   up.  Defendants have no control over that and defendants

25   have, as was stated in November 25th, in a letter

26   responding to the plaintiffs, defendants have reached out

1                                                                    21

2   to those third parties and requested that they remove

3   anything relating to Digs that ties it to the address of

4   the current store or that ties it to Madonna and Company.

5           We have tried, we have used our best efforts, and

6   we would continue to do so.  And if they want to go

7   directly to those third parties there is nothing the

8   defendants could do more than what they have done.  There

9   is no desire on the part of Madonna and Company, the

10  defendants, to have any relationship whatsoever with this

11  Digs brand.

12          THE COURT:   Anything else you want to say?

13          MR. PLATT:   Oh, one last thing with the Meta tag

14  issue, again, we have a declaration from the third-party

15  consultant that there are no Meta tags, there is no source

16  code, there's nothing in the website that involves Digs

17  with the Madonna co-website.

18          The reason that they're saying that if you type in

19  Madonna or the name Madonna and Co or the address and

20  sometimes that, in a regular, natural search on Google,

21  that will pop up.  That's because the plaintiffs themselves

22  only have a website that doesn't do e-commerce, they don't

23  have marketing.  That the names of Geralynn Madonna and the

24  individual names of the plaintiffs are the address of the

25  old store are tied on the internet with old marketing, old

26  P.R., for two years.

1

2         So the algorithms of Google continue to pick that

3   up.  There's nothing we can do to change that.  That has

4   nothing to do with anything defendants are doing, and that

5   we assume will go away over time as the plaintiffs develop

6   their website.  There's nothing whatsoever that the

7   defendants are doing that would create that situation.

8         THE COURT:   All right.  Mr. Singer?  Are you

9   finished you now, Mr. Platt?

10        MR. PLATT:   Yes, Your Honor.

11        THE COURT:   Okay.  Thank you very much.

12        MR. SINGER:   Just one or two points here.  First,

13  I want to draw your attention, Your Honor, to in the main

14  papers we had filed in my client Ms. Rajwin's affidavit she

15  walks point by point from doing searches dating from, I

16  believe it was from November all the way through the middle

17  of February, how she was typing in the Digs names and

18  getting Geralynn Madonna at the top.  So this is has been

19  ongoing and again, it's been repeated again, and it's the

20  same problem.

21        Now as far as these hyperlinks that collect, you

22  understand, Your Honor, when the Geralynn Madonna would

23  come up on the screen when you are in a search right

24  underneath it you have these little buttons, these

25  hyperlinks.  One is called clothing and one was called

26  collections.  In other words, available to everyone.

23

1

2          All you would do is you would click in right on,

3    oh, I'm curious about the collections that Geralynn D.

4    Madonna and Madonna's Co.  You click it on and you get all

5    the trademark lines.  So there is simply no way,

6    impossible, that she would not have known about this.  We

7    don't believe it.  And further evidencing that, suddenly,

8    on January 30th, when January 29th when this lawsuit

9    started, she took that off right away.  I'm sorry, it's

10   just too coincidental.  That's number one.

11          THE COURT:  If she took it off.  What's the

12   problem?

13          MR. SINGER:  Well, it's because how it's affected

14   the search engines and we're concern is it's still coming

15   up to the top.  The only reasonable explanation at point is

16   because they have some program in their Met tags though

17   they have not displayed that as part of their exhibit, I

18   thought that needs to be disclosed because that is majorly

19   affecting my client.

20          The other issue is, Your Honor, are the third-

21   party sites.  Now we don't need to look at the reply papers

22   to see the continuing egregiousness of the third-party

23   sites.  They're all in my primary papers.  I was attaching

24   them again to help the Court out.

25          Okay.  The Yelp sites are here.  I've seen it

26   start from January 27 in Exhibit X, you know, saying --

24

1

2  referring to -- making the references to the Digs name.  So

3  we don't need to go back to look at the reply papers exist.

4  So it is summarized.

5          The problems with the search engines coming up

6  must be the Meta tags or something in the programming, same

7  thing affecting the ads, the Google ads coming up when you

8  search for Digs.  Number two, continuation on third-party

9  sites has to be stopped.  That's it.

10         THE COURT:  All right.  Okay.  Have you answered

11 yet?

12         MR. PLATT:  No, Your Honor.

13         THE COURT:  When's your answer due?

14         MR. PLATT:  I believe it's due in two weeks.

15         THE COURT:  Okay.  Anything else you want to add,

16 Mr. Singer?  If you want to consult with your clients,

17 fine.

18         MR. SINGER:  What my client's explained to me,

19 and I've done the searches myself and they had just done

20 them again yesterday.  It's very clear to the Court,

21 anything that we had done they've been doing searching

22 anything relating to Digs.  So Digs clothing, Digs NYC,

23 anything an ordinary person would use to try to find some

24 information about the Digs brand, Geralynn Madonna's coming

25 up on top or just below, it's creating confusion.  That

26 problem needs to be resolved.

1                                                           25

2              THE COURT:   Okay.  I'm prepared to rule on this

3   unless anybody wants to add anything else.

4              MR. SINGER:   Your Honor, may I just take a --

5              THE COURT:   Sure.

6              (Pause in proceedings on the record.)

7              MR. PLATT:   May I speak, Your Honor?

8              THE COURT:   Well after Mr. Singer speaks.

9              MR. SINGER:   Just my client has reminded me of

10  one thing and we had mentioned this in our primary papers

11  as well.  One of the major problems that's affecting

12  because the searches and they're not coming up as they

13  should, above the Madonna, is that they've been holding off

14  on re-setting up their ecommerce site, which is where a

15  significant amount of their income was coming from.

16             That can't be done until this is problem solved.

17  So they're continuing to not be able to do that.  If they

18  do it, then again, it's going to just strengthen the

19  Madonna brand by creating more confusion.  It's not a

20  complicated situation.

21             THE COURT:   Mr. Platt?

22             MR. PLATT:   Your Honor, at the end here they've

23  raised only two issues.  One is this issue relating Meta

24  tags, which is pure conjecture, and it sounds like from the

25  description that they want a preliminary injunction against

1                                                                26

2   the internet.  It's incomprehensible, what they're

3   discussing here.

4           The fact that searches come up through algorithms

5   for a group of people who are in business for two years,

6   whose all names and addresses were associated with these

7   purported marks, that the internet.  That's Google, that's

8   algorithms, there's nothing we can change about that until

9   the plaintiffs develop their website and develop their

10  company and they end up on Google's algorithms coming up

11  first.

12          Secondly, as far as any third-party sites, as we

13  said, the defendants --

14          THE COURT:  Have you been in touch with Google to

15  ask them to stop their -- or change their algorithms so

16  that whatever confusion might occur does not occur?

17          MR. PLATT:  No, I mean, that's Google.

18          THE COURT:  Just a minute.

19          MR. PLATT:  Your Honor, there's no infringing

20  activity.  We've contacted -- and then as far as the third

21  parties go, with respect to every third party that's listed

22  in the order to show cause the defendants have either

23  previously, well, have previously contacted those third

24  parties and requested any changes.  There's no desire on

25  the defendant's part to have their name associated with

27

Digs.  They're not trying to do so and they've used every

best effort possible.

        With respect to third parties, they have control

of them and they would continue to do so but they don't

have any control.

        THE COURT:   All right.

        MR. PLATT:   And I think they've cited one --

white pages.

        THE COURT:   Well the three that I have in my

notes are Yelp, white pages and Google.

        MR. PLATT:   Well Google is two things, Your

Honor, too and when they're mentioning Google, I think

they're alleging direct links that are paid with Google.

Which again, in our papers, don't exist?

        THE COURT:   Yeah.

        MR. PLATT:   And that's number one.  Number two is

just Google's general search, searching the internet when

you put in a name or you put in an address and what comes

up.  That's Google, that's the internet.

        THE COURT:   Okay.  I understand.

        MR. PLATT:   Thank you, Your Honor.

        THE COURT:   All right, Mr. Singer.

        MR. SINGER:   Just very brief so you can have --

        THE COURT:   You get -- this is the last word.

1

2          MR. SINGER:   This is the last word, last word,

3  Your Honor.   I think there's no dispute that there's --

4          THE COURT:   You have the burden so you have the

5  last word.

6          MR. SINGER:   There's no dispute that for at least

7  two of the sites there's continuing infringement, okay.

8  There is the Yelp and the white pages.  You know, and I'll

9  get to Google in a second.  But Yelp, like it is, we need

10  Your Honor's help to get that, to get that off.

11          And then there's the Google.  They're misstating

12  what the Google.  There's a couple of problems with Google.

13  One is, it's a search engine problem which I've cited many

14  times in my arguments.

15          The other is the Google ads would actually

16  referenced Digs, and my client's just reminded me, were

17  just causing a problem.

18          Number three, which I cited on my papers as well,

19  is that when you search Google, the images on your, you

20  know, on the Google pages you're getting images for Digs,

21  you know, associated with the when you're searching G.M.

22  mark, et cetera.

23          THE COURT:   As I understand the defendant's

24  position, however, with respect to Yelp and white pages,

25  it's because of algorithms that exist in the search engines

29

themselves and not because of any listings occasioned by

the defendant Madonna and Company.

MR. SINGER:   Right.   Right.   Sorry, Your Honor.

The way it works at sites (indiscernible) is the user -- I

don't, frankly, believe that Madonna can't control it.   The

way it works with, besides, like Yelp, this is an

advertising site.   You go in there, you log in, you put

your information in so the -- if they still have formerly

known as Digs in there it's because they haven't taken it

out.   And if there's some issue they're having with Yelp

then Yelp needs to take it out.   It's not an algorithm

situation.

THE COURT:   I asked Mr. Platt that question,

formerly known as Digs, and I gather you represented the

court in open court that that's no longer operational, is

that right, Mr. Platt?

MR. PLATT:   Correct, Your Honor.

MR. SINGER:   Okay.   Well, if you go on -- well,

if I -- I ask the Court to go on Google.   I'm able to see

it.   My client just gave me screenshots yesterday which had

it referenced.   So I'm sorry, I dispute that with Mr. Platt

as an incorrect statement.

THE COURT:   Mr. Platt?

MR. PLATT:   May I speak, Your Honor?   As I said

1

2  before, that defendants are not using formerly know as Digs

3  Moda, Digs Moda Soho.  That if there is a third-party

4  website that is left out there for some reason from an old

5  listing from the company we have no control over it.  We

6  are not using it and as we have said, as defendants have

7  said before, they have reached out to everybody on that

8  list and I don't think there's -- I don't -- I believe it's

9  in our papers.  There might be one or two left that still

10  have that, that the defendants have absolutely no control

11  over.

12          And I think the one example is white pages and I

13  believe --

14          THE COURT:   Okay.  I really have heard enough

15  now.

16          MR. PLATT:   Okay.

17          THE COURT:   We're repeating ourselves.  I've read

18  the papers which in support of the order to show cause, the

19  response from Madonna.  I have not read the reply that was

20  filed untimely this morning.  A, I didn't have time to and,

21  B, it's inappropriate because the schedule that the

22  plaintiff sought was the one I imposed.  It did allow for a

23  reply but the papers that the defendant filed were not

24  anymore voluminous than the papers filed by the plaintiff

25  in support of its preliminary injunction.

1 |                                                           31

2 |         The nature of preliminary injunction is that

3 | you've got to get the facts in, get the law in, get it in

4 | quickly.  Now to obtain a preliminary injunction a

5 | plaintiff has to show the likelihood of success in the

6 | merits.  The likelihood of irreparable harm in the absence

7 | of the injunction, a balance of hardship tipping decidedly

8 | in the favor of the plaintiff, and the public is not

9 | disturbed by the issuance of the injunction.  That's

10 | Salinger against Colting, 607 F.3d 68, pages 79 to 80 in

11 | the 2d Cir. 2010.

12 |         Here the plaintiff Digs fails to demonstrate

13 | irreparable harm.  Digs alleges that Madonna and Company

14 | has engaged in the plethora of actions which infringe upon

15 | its trademarks since October 31st, 2013.  That's in the

16 | complaint in paragraph 62.

17 |         But Digs waited until January 29th to file its

18 | complaint, almost three months after the alleged violations

19 | began.  That's when the relationship between the parties

20 | terminated.

21 |         Digs then waited an additional six weeks to move

22 | for a preliminary injunction on March 12, 2014.  Digs was

23 | well aware of the alleged infringements during this time

24 | and, therefore, cannot justify its delay.

25 |         As early as November 1st, 2013 Digs requested that

1                                                              32

2  Facebook remove certain items from Madonna and Company's

3  profile and on November 18th it sent Madonna and Company a

4  letter describing its objections.

5            Furthermore, Digs supported its complaint with

6  exhibits depicting websites accessed on December 11th, 2013

7  or earlier, despite not filing its complaint for another

8  month and a half.  Its motion for preliminary injunction

9  merely attaches these exhibits and rehashes the same

10 infringement that alleged in the complaint.

11           The information about the so-called infringement

12 had become stale by this time.  Such a significant and

13 unexplained delay alone justifies denial of the preliminary

14 injunction.  CitiBank v. Citytrust, 756 F.2nd 273, 276 (2nd

15 Cir. 1985).

16           An injunction is also inappropriate because there

17 is no allegations that I can credit of any real ongoing

18 infringements.  Digs bases its motion on Madonna and

19 Company's use of the marks prior to the filing of the

20 complaint.  But defendant, I find, has removed all the

21 items from its website and has requested the third-party

22 websites do the same.

23           It appears that there are now only three websites

24 that contain the marks:  Storeboard, White Pages, Yelp in

25 addition to Google and defendant has requested the content

33

be removed from each.  The trivial uses by third-party

websites cannot create irreparable harm not has Digs

established that there is reasonable expectation that a

fringing conduct will resume, and if it does, there's

remedies for that.

Rather than posing a continuing threat Madonna and

Company appears to have engaged in a conscientious effort

to disassociate itself from Digs.  As a result there exists

no likelihood of irreparable harm and therefore, the

issuance of a preliminary injunction is not warranted.

If there's any valid claim here, it's claim for

monetary damages.  But those claims face serious problems

on the face of the pleading.  For example, plaintiffs may

be unable to establish ownership over the marks, which is

the sine qua non of a trademark infringement action, Sports

Authority Yankee v. Prime Hospitality, 89 F.3d 955, 960(2nd

Cir. 1996).

Additionally, it is doubtful whether defendant's

use of the phrase, quote, formerly Digs Mota Soho, unquote,

is likely to mislead consumers into believing an

association with Digs still exists.  In any event, I accept

counsel's representation that the reference to formerly

Digs Mota Soho is no longer current, no longer in use.  See

Kassbaum v. Steppenwolf Productions, 236 F.3d 487 at 492,

                                                              34

493 (9th Cir. 2000), nor has Digs established that the

appearance of the mark and the non-domain name portion of a

single URL or in the Meta data and source code allegedly on

defendant's websites are uses as a mark, see <u>Interactive</u>

<u>Productions Corp. against a2z Mobile Office Solutions</u>, 326

F.3rd 687, 696, 697 (6th Cir. 2003).

          Given these concerns I suggest the parties, that

they engage in meaningful discussions to complete the

severance of their business arrangements rather than engage

in long, drawn-out litigation that will not benefit either

party.

          The motion for preliminary injunction and a

temporary restraining order are denied.  Defendant should

answer the complaint and should engage in discovery.  If

there's any repeats of the conduct which caused plaintiff's

concern, it's a conduct which I found to be emulative is

now reversed.  There's always an opportunity to file new

motions but right now the motion for a preliminary

injunction is denied.

          When you file your answer, Mr. Platt and Mr.

Finkelstein, I suggest you also file a civil case

management plan.  We'll have a conference shortly after

that.

          That constitutes the finding of the Court and the

1

2    ruling on the preliminary injunction.  As I say, it's been

3    recording so you can order transcripts.  Marlon, you let

4    them know how to get the transcript.

5              THE CLERK:   Yes, sir.

6              THE COURT:   Okay.  Thank you very much.

7              MR. PLATT:   Your Honor, may I just ask a

8    question?

9              THE COURT:   Yes.

10             MR. PLATT:   If the defendant's intention moved to

11   dismiss the complaint do we still need to comply with the

12   letter requirement?

13             THE COURT:   Well, I think a motion to dismiss,

14   it's unlikely to be granted, I mean given the facts here.

15   There is -- there are factual disputes.  The facts is such

16   that plaintiff is not entitled to a preliminary injunction.

17   I don't think you could ever make out a claim that, you

18   know, the facts don't raise an issue that can go forward

19             But if you want to make your motion to dismiss my

20   procedures call for a letter and a pre-motion conference

21   which I'd ask you to follow.  But I can tell you right now,

22   Mr. Finkelstein, it's not likely to be granted.

23             MR. FINKELSTEIN:   I understand, Your Honor.

24             THE COURT:   Okay.  So you ought to answer, then

25   file the civil case management plan which you really ought

```
 1                                                    36
 2   to do in my humble opinion and I commend it for you, for
 3   whatever it's worth, is retain the service of a mediator
 4   and compose your differences so that both sides can get on
 5   with doing what they're in business to do, which is engage
 6   in meaningful commerce.  Thank you.
 7             MR. FINKELSTEIN:   Thank you, Your Honor.
 8             (Whereupon the matter is adjourned.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                                                      37

 2                   C E R T I F I C A T E

 3

 4          I, Carole Ludwig, certify that the foregoing

 5   transcript of proceedings in the United States District

 6   Court, Southern District of New York, Digs NYC L.L.C. et

 7   al. v. G.M. Madonna & Co. L.L.C., Docket number 14cv538,

 8   was prepared using digital transcription software and is a

 9   true and accurate record of the proceedings.

10

11

12

13

14   Signature_____

15

16   Date:   April 2, 2014

17

18

19

20

21

22

23

24

25
```