UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

DIGS NYC LLC, EVANTHIA a/k/a "EVA"
RAJWANS, and BHUPINDAR a/k/a "BHINDA"
RAJWANS,

                                    Plaintiff,

                    -against-

G.M. MADONNA & CO., LLC f/k/a DIGS MODA
GROUP, LLC f/k/a DIGS MODA LLC,
MADONNA & CO., LLC f/k/a DIGS MODA
SOHO LLC, MADONNAANDCO.COM, LLC
f/k/a DIGS MODA.COM LLC, and GERALYNN
MADONNA,

                               Defendants.

------------------------------------------------------------ x

No. 14 Civ. 0538 (PAC)

**ANSWER WITH
AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND
JURY DEMAND**

       Defendants G.M. Madonna & Co., LLC f/k/a Digs Moda Group, LLC f/k/a Digs Moda

LLC; Madonna & Co., LLC f/k/a Digs Moda Soho LLC; and Madonnaandco.com LLC f/k/a

Digs Moda.com LLC; and Geralynn Madonna ("Geralynn"; collectively, "Defendants"), by their

undersigned attorneys, Finkelstein Platt LLP, as and for their Answer to the complaint (the

"Complaint") of plaintiffs Digs NYC LLC; Evanthia "Eva" Rajwans ("Eva"); and Bhupindar

"Bhinda" Rajwans ("Bhinda"; collectively, "Plaintiffs"), state as follows:

       1.      Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 1 of the Complaint.

       2.      Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 2 of the Complaint.

       3.      Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 3 of the Complaint.

       4.      Defendants admit the allegations set forth in paragraph 4 of the Complaint, except

state that defendant G.M. Madonna & Co., LLC was formerly known as DIGS MODA LLC rather than DIGSMODA LLC.

5.     Defendants admit the allegations set forth in paragraph 5 of the Complaint.

6.     Defendants admit the allegations set forth in paragraph 6 of the Complaint.

7.     Defendants admit the allegations set forth in paragraph 7 of the Complaint.

8.     Defendants neither deny nor admit the allegations set forth in paragraph 8 of the Complaint.

9.     Defendants neither deny nor admit the allegations set forth in paragraph 9 of the Complaint.

10.     Defendants neither deny nor admit the allegations set forth in paragraph 10 of the Complaint to the extent that they state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 10 of the Complaint.

11.     Defendants neither deny nor admit the allegations set forth in paragraph 11 of the Complaint, which state a legal conclusion to which no response is required.

12.     Defendants neither deny nor admit the allegations set forth in paragraph 12 of the Complaint, which state a legal conclusion to which no response is required.

13.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 13 of the Complaint.

14.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 14 of the Complaint.

15.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 15 of the Complaint.

16.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 16 of the Complaint.

17.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 17 of the Complaint.

18.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 18 of the Complaint.

19.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 19 of the Complaint.

20.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 20 of the Complaint.

21.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 21 of the Complaint.

22.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 22 of the Complaint.

23.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 23 of the Complaint, except deny that Plaintiffs have any interest, including intellectual property rights, in or to the "DIGS Beaute Mark", as defined in paragraph 23 of the Complaint.

24.      Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 24 of the Complaint.

25.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 25 of the Complaint.

26.     Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 26 of the Complaint.

27.     Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 26 of the Complaint and state that, to the extent that

Plaintiffs obtained registration of the Digs Beaute Mark with the USPTO, Plaintiffs did so

unlawfully.

28.     Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 28 of the Complaint.

29.     Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 29 of the Complaint.

30.     Defendants deny the allegations set forth in paragraph 30 of the Complaint.

31.     Defendants deny the allegations set forth in paragraph 31 of the Complaint,

except admit that beginning in or about April 2011, Eva, Bhinda and Geralynn engaged in

discussions concerning a potential business venture.

32.     Defendants deny the allegations set forth in paragraph 32 of the Complaint,

except admit that Geralynn was a customer of the Plaintiffs' retail store located at 1054 Third

Avenue (the "Existing DIGS Store").

33.     Defendants admit the allegations set forth in paragraph 33 of the Complaint.

34.     Defendants admit the allegations set forth in paragraph 34 of the Complaint.

35.     Defendants admit the allegations set forth in paragraph 35 of the Complaint, and

further state that Eva, Bhinda and Geralynn engaged in numerous conversations concerning how

each of them could expand DIGS.

36.     Defendants deny the allegations set forth in paragraph 36 of the Complaint,

except admit that one of the purposes of the proposed business relationship was to expand DIGS

beyond the Existing DIGS Store.

37.     Defendants admit the allegations set forth in paragraph 37 of the Complaint.

38.     Defendants admit the allegations set forth in paragraph 38 of the Complaint.

39.     Defendants neither admit nor deny the allegations set forth in paragraph 39 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

40.     Defendants neither admit nor deny the allegations set forth in paragraph 40 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

41.     Defendants neither admit nor deny the allegations set forth in paragraph 41 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

42.     Defendants neither admit nor deny the allegations set forth in paragraph 42 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

43.     Defendants neither admit nor deny the allegations set forth in paragraph 43 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

44.     Defendants deny the allegations set forth in paragraph 44 of the Complaint, except admit that, on or about September 7, 2011, Eva, Bhinda and Geralynn caused DIGS Moda Soho LLC to be formed, with DIGS Moda Group LLC as its sole member.

45.     Defendants admit the allegations set forth in paragraph 45 of the Complaint.

46.     Defendants deny the allegations set forth in paragraph 46 of the Complaint,

except admit that, in or about December 2011, DIGS Moda Soho LLC opened a store located at 284 Lafayette Street, New York, New York 10012 which did business under the name "DIGS Soho".

47.     Defendants admit the allegations set forth in paragraph 47 of the Complaint.

48.     Defendants deny allegations set forth in paragraph 48 of the Complaint.

49.     Defendants deny the allegations set forth in paragraph 49 of the Complaint.

50.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 50 of the Complaint.

51.     Defendants deny the allegations set forth in paragraph 51 of the Complaint, except admit that, in addition to substantial other payments and/or consideration, Eva and Bhinda received one payment in the amount of $4,000 and respectfully refer the Court to the document cited therein for its content and import.

52.     Defendants deny the allegations set forth in paragraph 52 of the Complaint.

53.     Defendants admit the allegations set forth in paragraph 53 of the Complaint.

54.     Defendants neither admit nor deny the allegations set forth in paragraph 54 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

55.     Defendants neither admit nor deny the allegations set forth in paragraph 55 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

56.     Defendants neither admit nor deny the allegations set forth in paragraph 56 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

57.     Defendants neither admit nor deny the allegations set forth in paragraph 57 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

58.     Defendants neither admit nor deny the allegations set forth in paragraph 58 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 58 of the Complaint.

59.     Defendants neither admit nor deny the allegations set forth in paragraph 59 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 59 of the Complaint.

60.     Defendants deny the allegations set forth in paragraph 60 of the Complaint.

61.     Defendants deny the allegations set forth in paragraph 61 of the Complaint.

62.     Defendants deny the allegations set forth in paragraph 62 of the Complaint.

63.     Defendants admit the allegations set forth in paragraph 63 of the Complaint that the Entity Defendants legally changed their names with the New York Department of State but deny the remainder of the allegations set forth therein.

64.     Defendants admit the allegations set forth in paragraph 64 of the Complaint.

65.     Defendants lack knowledge or information sufficient to form a belief regarding the contents of page one of Exhibit F to the Complaint, to which such allegations seem to refer and otherwise deny the allegations set forth in paragraph 65 of the Complaint.

66.     Defendants lack knowledge or information sufficient to form a belief regarding the allegations set forth in paragraph 66 of the Complaint.

67.     Defendants lack knowledge or information sufficient to form a belief regarding the allegations set forth in paragraph 67 of the Complaint, except admit that the URL and webpage identified in paragraph 67 of the Complaint apparently existed on the date set forth on page two of Exhibit F to the Complaint but no longer exists.  Defendants further state that, upon information and belief, neither the URL nor the webpage identified in paragraph 67 of the Complaint was part of Defendants' active website, as they existed only due to administrative oversight and were only reachable by either typing the full URL directly into a web browser or by reaching the page from an existing Internet hyperlink.

68.     Defendants lack knowledge or information sufficient to form a belief regarding the allegations set forth in paragraph 68 of the Complaint, except admit that the URL and webpage identified in paragraph 68 of the Complaint apparently existed on the date set forth on page three of Exhibit F to the Complaint but no longer exists.  Defendants further state that, upon information and belief, neither the URL nor the webpage identified in paragraph 68 of the Complaint was part of Defendants' website, as they existed only due to administrative oversight and were only reachable by either typing the full URL directly into a web browser or by reaching the page from an existing Internet hyperlink.

69.     Defendants deny the allegations set forth in paragraph 69 of the Complaint.

70.     Defendants deny the allegations set forth in paragraph 70 of the Complaint.

71.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 71 of the Complaint and the contents of Exhibits G and H to the Complaint, except admit that the URL and webpage identified on page two of Exhibit G to the Complaint and page two of Exhibit H to the Complaint existed on the dates set forth on such pages, but, upon information and belief, were not included as part of Defendants'

active website, as they existed only due to administrative oversight and were only reachable by either typing the full URL directly into a web browser or by reaching the page from an existing Internet hyperlink.

72.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 72 of the Complaint and the contents of Exhibit I to the Complaint, except admit that the URL and webpage identified on page two of Exhibit I to the Complaint existed on the date set forth on such page, but, upon information and belief, were not included as part of Defendants' active website, as they existed only due to administrative oversight, and were only reachable by either typing the full URL directly into a web browser or by reaching the page from an existing Internet hyperlink.

73.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 73 of the Complaint and the contents of Exhibit J to the Complaint and respectfully refer the Court to the document cited in paragraph 73 of the Complaint for its content and import.

74.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 74 of the Complaint and the contents of Exhibit K to the Complaint concerning a search for the term "Digs Bijoux" and deny the allegations therein that Defendants are attempting to mislead the consumer.

75.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 75 of the Complaint and the contents of Exhibit L to the Complaint.

76.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 76 of the Complaint and the contents of Exhibit L

to the Complaint that a search for "Madonna & Co" reveals any particular results, except admit that the URL and webpage identified on page ten of Exhibit L to the Complaint existed on the date set forth on such page, but, upon information and belief, were not included as part of the Defendants' active website, as they existed only due to administrative oversight and were only reachable by either typing the full URL directly into a web browser or by reaching the page from an existing Internet hyperlink, and deny that there was any material confusion by the public between Plaintiffs' brands and Defendants' brand.

77.     Defendants deny the allegations set forth in paragraph 77 of the Complaint, except admit that the Defendant entities have advertisements and business listings on the Internet.

78.     Defendants admit the allegations set forth in paragraph 78 of the Complaint.

79.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 79 of the Complaint.

80.     Defendants deny the allegations set forth in paragraph 80 of the Complaint.

81.     Defendants deny the allegations set forth in paragraph 81 of the Complaint, except admit that, for a period of less than five months, Defendants identified Defendants' store in Soho on certain business listings as "formerly DIGS Moda Soho" and/or "formerly DIGS Soho" but no longer do so.

82.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 82 of the Complaint and the contents of Exhibit O to the Complaint, except admit that, with respect to the circled content on page one of Exhibit O to the Complaint, for a period of less than five months, Defendants identified Defendants' store in Soho on certain business listings as "formerly DIGS Moda Soho" and/or "formerly DIGS

Soho" but no longer do so, and deny that Defendants have acted unlawfully in any respect.

83.     Defendants deny the allegations set forth in paragraph 83 of the Complaint.

84.     Defendants deny the allegations set forth in paragraph 84 of the Complaint.

85.     Defendants deny the allegations set forth in paragraph 85 of the Complaint, except admit that, Defendants updated the listing for newyork.citysearch.com for DIGS Moda Soho to reflect the new name Madonna & Co., and that that for a period of less than five months, Defendants identified Defendants' store in Soho on certain business listings as "formerly DIGS Moda Soho" and/or "formerly DIGS Soho" but no longer do so.

86.     Defendants deny the allegations set forth in paragraph 86 of the Complaint.

87.     Defendants deny the allegations set forth in paragraph 87 of the Complaint.

88.     Defendants deny the allegations set forth in paragraph 88 of the Complaint, except admit that, on October 31, 2013, Defendants posted "Our new DIGS" on their Facebook page.

89.     Defendants deny the allegations set forth in paragraph 89 of the Complaint, except admit that, starting on October 31, 2013, historical posts on Defendants' Facebook page remained thereon, and, without admitting that Defendants had any legal obligation to remove any such historical posts, Defendants were unable to do so until on or about December 4, 2013 because, in or about early November 2013, Eva and/or Bhinda caused Facebook to freeze Defendants out of their Facebook account.

90.     Defendants deny the allegations set forth in paragraph 90 of the Complaint, except admit that Plaintiffs contacted Facebook at least three times, causing Defendants to be frozen out of their Facebook account for approximately three and one-half weeks.

91.     Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 91 of the Complaint.

92.     Defendants deny the allegations set forth in paragraph 92 of the Complaint, and respectfully refer the Court to the document cited therein for its content and import.

93.     Defendants deny the allegations set forth in paragraph 93 of the Complaint, except admit that, the quoted statements appeared on Defendants' Yelp page on the date set forth on the document attached as Exhibit V to the Complaint.

94.     Defendants deny the allegations set forth in paragraph 94 of the Complaint and respectfully refer the Court to the document cited therein for its content and import.

95.     Defendants deny the allegations set forth in paragraph 95 of the Complaint.

96.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 96 of the Complaint.

97.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 97 of the Complaint, except admit that, on or about November 21, 2013, Yelp changed the listing for Defendants' store from "closed" to "renovated".

98.     Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 98 of the Complaint.

99.     Defendants deny the allegations set forth in paragraph 99 of the Complaint.

100.    Defendants deny the allegations set forth in paragraph 100 of the Complaint.

101.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 101 of the Complaint.

102.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 102 of the Complaint.

103.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 103 of the Complaint.

104.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 104 of the Complaint.

105.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 105 of the Complaint.

106.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 106 of the Complaint.

107.    Defendants admit the allegations set forth in paragraph 107 of the Complaint.

108.    Defendants deny the allegations set forth in paragraph 108 of the Complaint, except admit that Defendants did not remove historical posts on their Twitter account when they changed the identity of the account to Madonna & Co.

109.    Defendants deny the allegations set forth in paragraph 109 of the Complaint and state that the complained of interview was among the historical posts that Defendants did not remove from their Twitter account when they changed the identity of the account to Madonna & Co.

110.    Defendants deny the allegations set forth in paragraph 110 of the Complaint.

111.    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 111 of the Complaint.

112.    Defendants deny the allegations set forth in paragraph 112 of the Complaint.

113.    Defendants deny the allegations set forth in paragraph 113 of the Complaint and respectfully refer the Court to the document cited therein for its contents and import.

114.    Defendants deny the allegations set forth in paragraph 114 of the Complaint.

115. Defendants deny the allegations set forth in paragraph 115 of the Complaint.

116. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 116 of the Complaint.

117. Defendants deny the allegations set forth in paragraph 117 of the Complaint.

118. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 118 of the Complaint.

119. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations set forth in paragraph 119 of the Complaint.

120. Defendants deny the allegations set forth in paragraph 120 of the Complaint.

121. Defendants deny the allegations set forth in paragraph 121 of the Complaint.

122. Defendants deny the allegations set forth in paragraph 122 of the Complaint and respectfully refer the Court to the document cited therein for its contents and import.

123. Defendants deny the allegations set forth in paragraph 123 of the Complaint but admit that Defendants have sent emails, for a period of time from approximately from October 2013 through November 2013 to customers on Defendants' client list identifying the store as "formerly DIGS Soho".

124. Defendants deny the allegations set forth in paragraph 124 of the Complaint and respectfully refer the Court to the document cited therein for its contents and import.

125. Defendants deny the allegations set forth in paragraph 122 of the Complaint.

126. Defendants deny the allegations set forth in paragraph 126 of the Complaint.

127. Defendants deny the allegations set forth in paragraph 127 of the Complaint.

128. Defendants deny the allegations set forth in paragraph 128 of the Complaint and respectfully refer the Court to the document cited therein for its contents and import.

129.    Defendants deny the allegations set forth in paragraph 129 of the Complaint and respectfully refer the Court to the document cited for its contents and import.

130.    Defendants deny the allegations set forth in paragraph 130 of the Complaint.

131.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

132.    Defendants deny the allegations set forth in paragraph 132 of the Complaint.

133.    Defendants deny the allegations set forth in paragraph 133 of the Complaint.

134.    Defendants deny the allegations set forth in paragraph 134 of the Complaint.

135.    Defendants deny the allegations set forth in paragraph 135 of the Complaint.

136.    Defendants deny the allegations set forth in paragraph 136 of the Complaint.

137.    Defendants neither deny nor admit the allegations set forth in paragraph 137 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 137 of the Complaint.

138.    Defendants deny the allegations set forth in paragraph 138 of the Complaint.

139.    Defendants neither deny nor admit the allegations set forth in paragraph 139 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 139 of the Complaint.

140.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

141.    Defendants deny the allegations set forth in paragraph 141 of the Complaint.

142.    Defendants neither deny nor admit the allegations set forth in paragraph 142 of

the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 142 of the Complaint.

143.    Defendants deny the allegations set forth in paragraph 143 of the Complaint.

144.    Defendants deny the allegations set forth in paragraph 144 of the Complaint.

145.    Defendants deny the allegations set forth in paragraph 144 of the Complaint.

146.    Defendants neither deny nor admit the allegations set forth in paragraph 146 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 146 of the Complaint.

147.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

148.    Defendants deny the allegations set forth in paragraph 148 of the Complaint.

149.    Defendants deny the allegations set forth in paragraph 150 of the Complaint.

150.    Defendants neither deny nor admit the allegations set forth in paragraph 150 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 146 of the Complaint.

151.    Defendants deny the allegations set forth in paragraph 151 of the Complaint.

152.    Defendants neither deny nor admit the allegations set forth in paragraph 152 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 152 of the Complaint.

153.     Defendants deny the allegations set forth in paragraph 153 of the Complaint.

154.     Defendants neither deny nor admit the allegations set forth in paragraph 154 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 154 of the Complaint.

155.     Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

156.     Defendants deny the allegations set forth in paragraph 156 of the Complaint.

157.     Defendants neither deny nor admit the allegations set forth in paragraph 157 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 157 of the Complaint.

158.     Defendants deny the allegations set forth in paragraph 158 of the Complaint.

159.     Defendants deny the allegations set forth in paragraph 159 of the Complaint.

160.     Defendants deny the allegations set forth in paragraph 160 of the Complaint.

161.     Defendants neither deny nor admit the allegations set forth in paragraph 161 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 161 of the Complaint.

162.     Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

163.     Defendants admit the allegations set forth in paragraph 163 of the Complaint and respectfully refer the Court to the document cited for its content and import.

17

164.    Defendants neither admit nor deny the allegations set forth in paragraph 164 of the Complaint and respectfully refer the Court to the document cited for its content and import.

165.    Defendants neither admit nor deny the allegations set forth in paragraph 165 of the Complaint and respectfully refer the Court to the document cited for its content and import.

166.    Defendants deny the allegations set forth in paragraph 166 of the Complaint.

167.    Defendants deny the allegations set forth in paragraph 167 of the Complaint.

168.    Defendants deny the allegations set forth in paragraph 168 of the Complaint.

169.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

170.    Defendants deny the allegations set forth in paragraph 170 of the Complaint.

171.    Defendants deny the allegations set forth in paragraph 171 of the Complaint.

172.    Defendants deny the allegations set forth in paragraph 172 of the Complaint.

173.    Defendants deny the allegations set forth in paragraph 173 of the Complaint.

174.    Defendants deny the allegations set forth in paragraph 174 of the Complaint.

175.    Defendants deny the allegations set forth in paragraph 175 of the Complaint.

176.    Defendants deny the allegations set forth in paragraph 176 of the Complaint.

177.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

178.    Defendants neither deny nor admit the allegations set forth in paragraph 178 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 178 of the Complaint.

179.    Defendants deny the allegations set forth in paragraph 179 of the Complaint.

180.    Defendants neither deny nor admit the allegations set forth in paragraph 180 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 180 of the Complaint.

181.    Defendants neither deny nor admit the allegations set forth in paragraph 181 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 181 of the Complaint.

182.    Defendants neither deny nor admit the allegations set forth in paragraph 182 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 182 of the Complaint.

183.    Defendants neither deny nor admit the allegations set forth in paragraph 183 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 183 of the Complaint.

184.    Defendants neither deny nor admit the allegations set forth in paragraph 184 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 184 of the Complaint.

185.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

186.    Defendants neither deny nor admit the allegations set forth in paragraph 186 of

the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 186 of the Complaint.

187.   Defendants deny the allegations set forth in paragraph 187 of the Complaint.

188.   Defendants neither deny nor admit the allegations set forth in paragraph 188 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 188 of the Complaint.

189.   Defendants neither deny nor admit the allegations set forth in paragraph 189 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 189 of the Complaint.

190.   Defendants neither deny nor admit the allegations set forth in paragraph 190 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 190 of the Complaint.

191.   Defendants neither deny nor admit the allegations set forth in paragraph 191 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 191 of the Complaint.

192.   Defendants neither deny nor admit the allegations set forth in paragraph 192 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 192 of the

Complaint.

193.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

194.    Defendants deny the allegations set forth in paragraph 194 of the Complaint except admit that Defendant Geralynn Madonna, on behalf of Defendant Digs Moda Group, LLC, sought registration of the mark "DIGSMODA", having filed an intent to use application on or about April 17, 2012.

195.    Defendants deny the allegations set forth in paragraph 195 of the Complaint.

196.    Defendants deny the allegations set forth in paragraph 196 of the Complaint.

197.    Defendants neither deny nor admit the allegations set forth in paragraph 197 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 197 of the Complaint.

198.    Defendants neither deny nor admit the allegations set forth in paragraph 198 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 198 of the Complaint.

199.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

200.    Defendants deny the allegations set forth in paragraph 200 of the Complaint.

201.    Defendants deny the allegations set forth in paragraph 201 of the Complaint.

202.    Defendants deny the allegations set forth in paragraph 202 of the Complaint.

203.    Defendants lack knowledge or information sufficient to form a belief about the

truth of the allegations set forth in paragraph 203 of the Complaint except admit that, in or about November 2013, the United States Patent and Trademark Office issued a notice of allowance.

204.     Defendants deny the allegations set forth in paragraph 204 of the Complaint.

205.     Defendants neither deny nor admit the allegations set forth in paragraph 205 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 205 of the Complaint.

206.     Defendants neither deny nor admit the allegations set forth in paragraph 206 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 206 of the Complaint.

207.     Defendants neither deny nor admit the allegations set forth in paragraph 207 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 207 of the Complaint.

208.     Defendants neither deny nor admit the allegations set forth in paragraph 208 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 208 of the Complaint.

209.     Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

210.     Defendants neither deny nor admit the allegations set forth in paragraph 210 of the Complaint, which state a legal conclusion to which no response is required.  To the extent

that a response is required, Defendants deny the allegations set forth in paragraph 210 of the Complaint.

211.    Defendants neither deny nor admit the allegations set forth in paragraph 211 of the Complaint, which state a legal conclusion to which no response is required.  To the extent that a response is required, Defendants deny the allegations set forth in paragraph 211 of the Complaint.

212.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

213.    Defendants deny the allegations set forth in paragraph 213 of the Complaint.

214.    Defendants deny the allegations set forth in paragraph 214 of the Complaint.

215.    Defendants deny the allegations set forth in paragraph 215 of the Complaint.

216.    Defendants deny the allegations set forth in paragraph 216 of the Complaint.

217.    Defendants deny the allegations set forth in paragraph 217 of the Complaint.

218.    Defendants repeat and re-allege their answer to the foregoing paragraphs as if fully set forth herein.

219.    Defendants respectfully refer the Court to the Court's denial on the record on March 20, 2014 of Plaintiffs' motion for a preliminary injunction.

220.    Defendants respectfully refer the Court to the Court's denial on the record on March 20, 2014 of Plaintiffs' motion for a preliminary injunction.

221.    Defendants respectfully refer the Court to the Court's denial on the record on March 20, 2014 of Plaintiffs' motion for a preliminary injunction.

222.    Defendants respectfully refer the Court to the Court's denial on the record on March 20, 2014 of Plaintiffs' motion for a preliminary injunction.

223.    Defendants respectfully refer the Court to the Court's denial on the record on March 20, 2014 of Plaintiffs' motion for a preliminary injunction.

<u>**AFFIRMATIVE DEFENSES**</u>

**FIRST AFFIRMATIVE DEFENSE**

224.    Plaintiffs are not entitled to the relief sought because Plaintiffs have failed to state a claim upon which relief can be granted.

**SECOND AFFIRMATIVE DEFENSE**

225.    Plaintiffs are not entitled to the relief sought because Defendants have not violated any applicable law.

**THIRD AFFIRMATIVE DEFENSE**

226.    Plaintiffs' claims are barred by the doctrine of laches.

**FOURTH AFFIRMATIVE DEFENSE**

227.    Plaintiffs are not entitled to the relief sought because Plaintiffs have not suffered any damages.

**FIFTH AFFIRMATIVE DEFENSE**

228.    Plaintiffs' claims are barred by the doctrine of unclean hands.

**SIXTH AFFIRMATIVE DEFENSE**

229.    Plaintiffs are estoped from brining their claims.

**SEVENTH AFFIRMATIVE DEFENSE**

230.    Plaintiffs' claims are barred by the doctrine of waiver and/or because Plaintiffs acquiesced to use by Defendants of some or all of the marks alleged in the Complaint.

**EIGHTH AFFIRMATIVE DEFENSE**

231.    Plaintiffs' claims are barred because Plaintiffs failed to mitigate their damages.

## NINTH AFFIRMATIVE DEFENSE

232. Plaintiffs' alleged damages or injuries, if any, were proximately caused in whole or in part by the acts and/or omissions of Plaintiffs.

## TENTH AFFIRMATIVE DEFENSE

233. Plaintiffs' registration of some or all of the marks alleged in the Complaint were obtained fraudulently.

## ELEVENTH AFFIRMATIVE DEFENSE

234. The marks alleged in the Complaint are generic.

## TWELFTH AFFIRMATIVE DEFENSE

235. The claims made in the Complaint are barred, in whole or in part, by the doctrines of fair use, nominative fair use and/or descriptive use.

## THIRTEENTH AFFIRMATIVE DEFENSE

236. The claims made in the Complaint are barred, in whole or in part, by the First Amendment to the Constitution of the United States.

## FOURTEENTH AFFIRMATIVE DEFENSE

237. The claims made in the Complaint are barred, in whole or in part, because Defendants are not liable for the acts of others over whom the have no control.

## FIFTEENTH AFFIRMATIVE DEFENSE

238. Defendants reserve the right to assert additional defenses based on information learned or obtained during discovery.

## COUNTERCLAIMS

Defendants G.M. Madonna & Co., LLC f/k/a Digs Moda Group, LLC f/k/a Digs Moda LLC ("the "Company"); Madonna & Co., LLC f/k/a Digs Moda Soho LLC ("Madonna & Co."

or "Digs Moda Soho"); and Madonnaandco.com LLC f/k/a Digs Moda.com LLC; and Geralynn

Madonna ("Geralynn") (collectively, "Defendants"), by and through their attorneys, Finkelstein

Platt LLP, as and for their counterclaims against plaintiffs Digs NYC LLC ("DIGS"); Evanthia

"Eva" Rajwans ("Eva"); and Bhupindar "Bhinda" Rajwans ("Bhinda") (collectively, "Plaintiffs")

allege, upon knowledge with respect to their own acts and status, and upon information and

belief as to all other matters, as follows:

<u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction over the subject matter of this action pursuant to 15

U.S.C. § 1121, 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.

2.      Venue is proper in this district pursuant to 28 U.S.C §§ 1391(b) and (c).

<u>THE PARTIES</u>

3.      Defendant G.M. Madonna & Co., LLC is a limited liability company organized

under the laws of the State of New York with its principal place of business located at 284

Lafayette Street, New York, New York 10012.

4.      Defendant Madonna & Co., LLC is a limited liability company organized under

the laws of the State of New York with its principal place of business located at 284 Lafayette

Street, New York, New York 10012.

5.      Defendant Madonnaandco.com LLC is a limited liability company organized

under the laws of the State of New York with its principal place of business located at 284

Lafayette Street, New York, New York 10012.

6.      Defendant Geralynn Madonna is an individual who resides in New York, New

York and has a principal business address located at 284 Lafayette Street, New York, New York

10012.

7.      Upon information and belief, Plaintiff Digs NYC LLC is a limited liability company organized under the laws of the State of New York with its principal place of business located at 1054 3rd Avenue, New York, New York 10065.

8.      Upon information and belief, Plaintiff Evanthia "Eva" Rajwans is an individual with a principal business address located at 1054 3rd Avenue, New York, New York 10065.

9.      Upon information and belief, Plaintiff Bhupindar "Bhinda" Rajwans is an individual with a principal business address located at 1054 3rd Avenue, New York, New York 10065.

FACTS

*Eva and Bhinda Induce Geralynn to Enter into a Business Venture*

10.      Geralynn has spent more than thirty years in corporate fashion, beginning her career as an assistant buyer in 1978.  In or about 2003, Geralynn became the CEO of the entity that conducted the business of the women's fashion retail clothing brands Spiegel, Newport News, and Shape Fx (the "Spiegel Brands").

11.      Geralynn's background, among other things, includes significant experience as a merchant or buyer of women's apparel, as a manager of numerous merchants and buyers, and as a manager of numerous designers.

12.      Beginning in or about 2007, while CEO of the Spiegel Brands, Geralynn became acquainted with Eva and Bhinda as a customer of Plaintiffs' boutique clothing store, DIGS, first shopping at DIGS' store at 1079 Third Avenue, New York, and then continuing as a customer when the store moved across the street to 1054 Third Avenue, New York (the "Existing DIGS Store").

13.      Upon information and belief, the Existing DIGS Store is the one and only retail

27

store that Eva, Bhinda and/or DIGS has operated since 2006, with the exception of Plaintiffs'
and Defendants' business venture described herein.

14.     Upon information and belief, DIGS promoted and sold women's clothes that it
marketed as DIGS at the Existing DIGS Store (the "DIGS Brand").

15.     In or about early March 2011, Geralynn voluntarily tendered her resignation from
her position with the Spiegel Brands.  Geralynn's last day of employment with the Spiegel
Brands was April 29, 2011.

16.     Beginning in or about April 2011 until in or about September 2011, Eva and
Bhinda engaged in discussions with Geralynn regarding the potential for creating a business
endeavor to further develop and expand the DIGS Brand, including opening a second retail store
in New York City and starting an e-commerce site (the "Business Development Discussions").

17.     During the Business Development Discussions, Eva and Bhinda represented to
Geralynn on numerous occasions that (a) Eva was a designer, and designed many, if not most, of
the clothes for sale in the Existing DIGS Store; and (b) that if Geralynn engaged in a business
endeavor to further develop and expand the DIGS Brand, Eva would continue to design the
majority of clothes for the Company.

18.     In or about June 2011 through the end of September 2011, Eva, Bhinda and
Geralynn collaborated on creating a business plan which incorporated a number of Eva's and
Bhinda's representations, including as follows:

    a.   Eva was "an accomplished fashion designer";

    b.   "[T]he products available at DIGS are quite unique" in that they are "a mix of
         80% private label (designed exclusively for the DIGS labels) and 20% are
         unique worldwide finds that compliment the brand designs and also carry the

house labels"; and

  c. "[T]he [new] Company will be able to maintain successful business operations because of . . . Strong in-house Design."

19. During the Business Development Discussions, Eva and Bhinda represented Bhinda as a highly skilled business operator, which skills included, among other things, inventory management and logistics. Accordingly, it was planned that Bhinda would, among many other things, manage the inventory and logistics of the Company.

20. During the Business Development Discussions, Eva and Bhinda further represented that Eva and Bhinda would devote a substantial amount of their time to the planned business endeavor with Geralynn.

21. During the Business Development Discussions, Eva and Bhinda further represented that the Existing DIGS Store's customer email database included approximately 5,000 valid customer email addresses and that they would share that email list with the new venture.

22. Upon information and belief, within approximately two years prior to the Business Development Discussions, Eva individually and/or jointly with DIGS NYC LLC (and/or DIGS NYC, Inc.) was sued in at least three actions in the Supreme Court of the State of New York.

23. The first action brought against Eva and DIGS NYC LLC was by American Express Bank seeking $52,331.53 in damages. The second action brought against Eva was by American Express Centurion Bank seeking $50,241.25 in damages. Both of these actions ultimately settled.  The case brought by American Express Bank was settled on June 16, 2011.

24. The third action brought against Eva and DIGS NYC Inc. was by Slavet &

Altman, LLP, and resulted in a default judgment on May 17, 2010 in the amount of $22,784.00.

25.     Neither Eva nor Bhinda ever -- before, during or after the Business Development Discussions -- disclosed that either Eva or DIGS NYC LLC had been a party to a lawsuit in any jurisdiction or that there judgments entered against any of them.

*Eva, Bhinda and Geralynn Enter into a Business Venture*

26.     On or about September 6, 2011, Eva, Bhinda and Geralynn formed the Company (Digs Moda Group, LLC) which owns DIGS Moda Soho and DIGS Moda.Com LLC, both of which were formed contemporaneously with the Company. In other words, the Company is the sole member of DIGS Moda Soho and DIGS Moda.Com LLC (together, the "DIGS Moda Entities").

27.     The DIGS Moda Entities were formed primarily for the purpose of operating a new store located in Soho (the "DIGS Soho Store"), the digsmoda.com website, and further generally developing the DIGS Brand beyond the Existing DIGS Store.[1]

28.     The only relevant operating agreement concerning the DIGS Moda Entities is that of the Company (the parent company to the other defendant entities), which was effective as of September 6, 2011 (the "Operating Agreement"). Pursuant to the Operating Agreement, Geralynn owned a 50% membership interest and Eva and Bhinda jointly owned the remaining 50% interest of the Company.

29.     Among other things, the Operating Agreement provides that as partial consideration for Eva's and Bhinda's membership interests, Eva, Bhinda and DIGS granted a license to the Company to use the following trademarks: "<u>DIGS</u>", "<u>Royal DIGS</u>", "<u>Vintage DIGS</u>", "<u>DIGS Couture</u>", and "<u>DIGS Bijoux</u>" (as defined therein, the "Trademarks").

---

[1] The DIGS Moda Entities still exist and are the defendant entities named herein. As explained in paragraph 84-89, below, Geralynn is now the sole owner of the DIGS Moda Entities, and their names have been changed to their current names as set forth in the caption of this lawsuit.

30.     The Operating Agreement also provides that, as additional consideration for Eva's and Bhinda's membership interests, they will share with the Company any information that may be deemed proprietary by DIGS NYC LLC, which the Company will thereafter be authorized to use. This information includes the email list promised by Eva and Bhinda (to include 5,000 valid customer email addresses).

31.     As consideration for Geralynn's interest in the Company, Geralynn made an initial capital contribution to the Company in the principal amount of $40,000.

32.     The $40,000 capital contribution from Geralynn was paid by the Company to Eva and Bhinda as compensation.

33.     Additionally, pursuant to and in connection with executing the Operating Agreement, Geralynn loaned the Company $400,000 under certain conditions set forth in the Operating Agreement and certain loan documents (defined in the Operating Agreement as the "Initial Geralynn Loan") and an additional $110,000 (defined in the Operating Agreement as the "Geralynn Secondary Loans").

34.     The Geralynn Secondary Loans were used by the Company to compensate Eva and Bhinda in the amount of $110,000. This $110,000 payment to Eva and Bhinda was in the form of a loan from the Company that would be forgiven over time in certain percentages if the Company continued to do business after certain trigger dates. Because the Company continued to be in business after the final trigger date in or about June 2013, the Geralynn Secondary Loans were forgiven under the terms of the loan.

35.     None of the loans that Geralynn made to the Company have been repaid in any amount, nor has Geralynn ever been compensated by the Company in any manner whatsoever.

36.     For more than one year, starting in or about early 2012 through in or about June

2013, Geralynn personally paid for both Eva's and Bhinda's health care premiums.

37.     There were two Managing Members of the Company, Geralynn, on one hand, and Eva and Bhinda, jointly, on the other hand.

38.     Pursuant to the Company's Operating Agreement, and in connection with the licenses the Plaintiffs provided to the Company as consideration for Eva's and Bhinda's membership interest, Eva was charged with the office of Chief Creative Officer, including among her duties the responsibility to design clothes for the Company, and Bhinda was charged with the office of Chief Operating Officer, including among his duties the responsibility to oversee the construction of the DIGS Soho Store, operations of the Company, inventory for the DIGS Soho Store, logistics, and working with the Company's other members (Geralynn and Eva).

39.     Pursuant to the Company's Operating Agreement, and in connection with Geralynn's significant cash capital contribution ($40,000) and initial loans to the Company ($510,000), Geralynn was charged with the office of Chief Executive Officer. As CEO, it was contemplated that the other members would work with Geralynn.

40.     In particular, with respect to Eva's role as Chief Creative Officer and "designer", the Operating Agreement specifically provided that Eva would cooperate and collaborate with Geralynn. For example, the Operating Agreement sets forth that Geralynn was to "set, define, refine strategy and growth in partnership with other members," and "further develop brand/product concepts and establish new ones in partnership with CMO."

41.     Because a crucial point for Geralynn during the Business Development Discussions was that Eva and Bhinda would be receptive to modifying their current business practices to allow the DIGS Brand to grow beyond a one or two retail store operation, Eva and

Bhinda agreed to include in the Operating Agreement that Geralynn would "set, define, refine strategy and growth in partnership with other members".

42.     Geralynn was also responsible for, among other things, marketing, public relations, website development, social media, general strategy for the new DIGS Soho Store, and the general promotion of the DIGS Brand.

43.     Geralynn fulfilled each of her obligations under the Operating Agreement.

*Following the Opening of the DIGS Soho Store,*
*Eva and Bhinda Favored the Existing DIGS Store to the Detriment of the DIGS Soho Store*

44.     In or about December 2011, the DIGS Soho Store opened.  The DIGS Soho Store became commonly known amongst Eva, Bhinda and Geralynn, as well as the general public, as "DIGS Soho", "DIGS Moda", and "DIGS Moda Soho". The Company often advertised the DIGS Soho Store as "DIGS Moda" and "DIGS Moda Soho".

45.     Soon after the Company commenced business, Eva's and Bhinda's participation in the Company became superficial, as Eva and Bhinda were focused on the performance of the Existing DIGS Store to the detriment of the DIGS Soho Store.

46.     Also soon after the Company commenced business, Eva and Bhinda attempted to manipulate the Company by preventing Geralynn from participating in decisions concerning the Company.

47.     For example, Bhinda was responsible for the management of the construction and build-out of the DIGS Soho Store.

48.     Despite representations of his purported expertise with respect to the construction and build-out of a store, Bhinda negligently managed this process, exercising little or no control over the contractors and consultants.

49.     As a result, the construction was delayed and over budget.

50.     In addition, Bhinda did not safeguard the Company's money with reasonable procedures or care.

51.     For example, Bhinda arranged for the first contactor hired for the work to be paid an up-front lump sum. Before the first contractor performed any substantial amount of work, it became clear that the contractor was unable to perform. Bhinda sought to recover from that first contractor only a minimal portion of the entire lump sum previously paid. When Geralynn asked Bhinda to pursue an addition refund, Bhinda refused and discouraged Geralynn from pursuing the matter herself. Bhinda nonchalantly told Geralynn that the contractor was probably out of the country and that it was not worthwhile.

52.     In addition, Bhinda paid a deposit to a contractor to install storefront glass. Geralynn objected to Bhinda's payment of this deposit because she believed it was premature to do the work.  However, Bhinda told Geralynn that he and Eva were working with the same contractor at their Existing DIGS Store.

53.     The Company ultimately decided not to have the storefront glass installed at that time, but Bhinda refused to request that the contractor return the deposit because Bhinda claimed that the contractor already purchased the glass.

54.     As a result, Geralynn acquiesced and asked Bhinda to have the glass delivered for the Company's use. Bhinda refused, providing no reasonable explanation, and, upon information and belief, never attempted to obtain either the Company's money which was paid as a deposit, or the glass it was alleged to have purchased in the alternative.

55.     Upon information and belief, the storefront glass that the Company paid for but never received was installed at Plaintiffs' Existing DIGS Store.

56.     Bhinda's behavior in this regard was the beginning of a pattern of neglect on the

part of both Bhinda and Eva of the business of the Company (and the DIGS Soho Store) as they focused all of their attention and resources to the Existing DIGS Store.

57.     Just prior to the opening of the DIGS Soho Store in December 2011, Bhinda advised Geralynn that approximately one-third of the ordered (and paid for) items of the very first delivery of merchandise to be offered for sale in the DIGS Soho Store was mysteriously missing.

58.     Notwithstanding that Geralynn insisted that Bhinda investigate further what happened to the missing inventory from the first merchandise order for the DIGS Soho Store, Bhinda refused to do so and further refused to provide Geralynn with any details regarding the Company's purchase of the "stolen" merchandise. When Geralynn attempted to investigate this matter herself, Bhinda discouraged her and refused to cooperate.

59.     Despite Bhinda's responsibility to the Company for inventory and logistics, Bhinda did nothing to determine where the missing inventory may have gone and, in or about the first quarter of 2012, speculated to Geralynn that it must have been stolen. Bhinda told Geralynn to just not worry about the missing inventory.

60.     Contrary to Eva's and Bhinda's representations otherwise during the Business Development Discussions, and Eva's role in the Company as prescribed by the Operating Agreement, Eva refused to design any clothing for the Company.

61.     Upon information and belief, at no time did Eva ever design any clothing for the Company or arrange for any exclusive designs of third-parties to be manufactured for the Company.

62.     Upon information and belief, all clothing purchased or manufactured for the Company for resale at retail was purchased by Eva directly from wholesalers. Rather than

design, as promised and obligated, all Eva ever did was play the role of a buyer or merchant.

63.     Contrary to Eva's and Bhinda's representations otherwise during the Business Development Discussions, and as required by the Operating Agreement, Eva and Bhinda refused to give the Company the promised email list for DIGS NYC LLC with 5,000 valid customer email addresses. Instead, Eva and Bhinda provided the Company with a list of approximately less than 100 valid email addresses.

64.     Eva and Bhinda also engaged in efforts to freeze Geralynn out of the management and operation of the Company through a "good-cop/bad-cop" routine.

65.     For example, throughout their business relationship, during discussion of Company business, Eva would frequently become aggressively agitated, often times screaming and using profane language, followed by storming out of meetings. Bhinda would then assure Geralynn that Eva's behavior would stop. However, Eva's behavior never changed.

66.     In or about late September 2011, while the Company had a temporary office in Soho, Eva's screaming and use of profanity caused the landlord of the temporary office to warn the Company that Eva's behavior disturbed other office tenants, causing complaints, and would not be tolerated. After Eva stormed out, Geralynn advised Bhinda that she wanted to dissolve the Company because she could not tolerate Eva's behavior. Bhinda convinced Geralynn to continue with the Company by representing to her that Eva would not conduct herself so inappropriately any further and that Eva's behavior was due to Eva being "creative".

67.     As the business relationship continued, Eva continued to have outbursts of inappropriate behavior, each time Bhinda rationalizing that Eva's conduct was a consequence of her being "creative" and ensuring Geralynn that Eva's inappropriate conduct would stop.

68.     As time moved forward, Eva refused to engage in any meaningful

36

communication, cooperation, or collaboration with Geralynn.

69.     In addition, soon after the DIGS Soho Store opened in December 2011, Eva and Bhinda began to effectively and progressively disassociate from the operations of the Company by, among other things, giving little attention to the DIGS Soho Store or development of the DIGS brand generally, the digsmoda.com website, or general expansion; all the while devoting significant (indeed the majority of their) time and energy to their Existing DIGS Store.

70.     Each time that Geralynn voiced her dissatisfaction of Eva's and Bhinda's disassociation with the Company and the DIGS Soho Store, Bhinda represented that both he and Eva would participate more in the business of the Company.

71.     Both Eva and Bhinda completely refused to allow Geralynn to implement any improvements or new business procedures beyond the simple retail operational procedures that Eva and Bhinda had operated under at the Existing DIGS Store. Each time that Geralynn voiced objection to Eva's and Bhinda's refusal to allow Geralynn to implement new procedures, both Eva and Bhinda completely refused to engage in any substantive conversations because, as Bhinda repeatedly told Geralynn, he and Eva knew best how to operate the Company. However, Bhinda consistently told Geralynn that they could talk further, at some unknown time, about changes.

72.     Upon information and belief, Bhinda consistently engaged in such tactics to placate Geralynn, with the intent that Eva and Bhinda would run the Company in their desired manner, with no input from Geralynn, for their benefit as long as possible.

73.     Beginning as early as the opening of the DIGS Soho Store (in or about December 2011), Eva and Bhinda engaged in a pattern of taking merchandise (apparel) and other products (for example, hangers and custom bags) from the DIGS Soho Store for their personal benefit

and use at their Existing DIGS Store.

74.    Bhinda and Eva also regularly and improperly charged personal expenses (such as healthcare), or expenses for their Existing DIGS Store (such as travel) to the DIGS Soho Store.

75.    On a regular, almost weekly, basis beginning in early 2012 and through the summer of 2013, Geralynn provided invoicing information to Eva and Bhinda detailing Eva's and Bhinda's expenses improperly charged to the Company.

76.    In response, throughout 2012 through June 2013, Eva and Bhinda consistently promised that they would reimburse the DIGS Soho Store for the personal expenses they charged and for the items they took from the DIGS Soho Store for sale at their Existing DIGS Store, but that they did not currently have enough money to do so. Eva and Bhinda further represented that, as soon as they had the money, they would reimburse the DIGS Soho Store.

77.    In reliance on Eva's and Bhinda's representations throughout 2012 and through June 2013 that they would reimburse the DIGS Soho Store, Geralynn did not seek to dissolve the Company.

78.    To date, neither Eva nor Bhinda has reimbursed the DIGS Soho Store for the personal expenses they charged and for the items they took from the DIGS Soho Store for sale at their Existing DIGS Store.

79.    In or about March 2013, Eva and Bhinda evidenced behavior that they had no intention to expand or develop the DIGS Brand with Geralynn. Eva and Bhinda rarely came to the DIGS Soho Store, rarely communicated with Geralynn, and refused to physically meet with her, or, if they agreed to meet, they would then cancel.

80.    In or about June 2013, Geralynn, Eva and Bhinda began to individually, and then through counsel, negotiate terms whereby Geralynn would take over sole ownership of the

Company, to pursue business under a new brand. At this time, both the Initial Geralynn Loan ($400,000) and the Geralynn Secondary Loans ($110,000) were in default, with no amounts paid on either.

81.     In or about June 2013 through September 2013, Eva and Bhinda made it so that the Company could barely function. Eva refused to order merchandise for the DIGS Soho Store. When Geralynn took it upon herself to order merchandise for the DIGS Soho Store, Eva cancelled the orders without telling Geralynn.

82.     Upon information and belief, Eva's and Bhinda's actions and/or inactions with respect to the DIGS Soho Store were undertaken in a deliberate and intentional manner in an effort to starve the Company of merchandise and cash flow.

83.     In or about April 2013, the Company was audited by the New York State Department of Labor which advised Geralynn that the audit was solely related to the Company's association with Eva and Bhinda, as a result of their employment and payment practices (past and present) at the their Existing DIGS Store. This caused significant administrative disruption and expense to the Company, and has caused the Company to be subject to future audits solely due to its now prior association with Eva and Bhinda.

*Eva and Bhinda Agree to Transfer Their Ownership of the Company to Geralynn*

84.     After direct negotiation and negotiation through counsel, Geralynn, on the one hand, and Eva and Bhinda, on the other hand, ultimately entered into a Membership Transfer Agreement, which was executed on September 23, 2013 (the "Membership Transfer Agreement"). The Membership Transfer Agreement provides, among other things, that Geralynn now owns the Company as its sole member, and the Company continues to own the remainder of the defendant entities.

85.     The Membership Transfer Agreement further provides that (a) Geralynn would change the name of the DIGS Soho Store; (b) Geralynn (and the defendant entities) would be permitted to continue to use the license to the Trademarks (as defined in the Operating Agreement) through October 30, 2013 (the "Transition Period"); and (c) Geralynn (and the defendant entities) would retain but change the name of the domain of the website that Geralynn developed for the Company.

86.     The Membership Transfer Agreement (Section 1.02.2.6) expressly provides that the Company shall retain all of its Intellectual Property, and specifically bars Plaintiffs from using the Company's various names in any manner:

> The Rajwans, individually or jointly, and any entity in which the Rajwans, individually or jointly, are members, shareholders, partners, or in which either or both have any interest, or any entity affiliated with any entity in which the Rajwans, individually or jointly, have an interest, including without limitation DIGS NYC LLC, shall not use the following names in any manner whatsoever, commercial or otherwise: DIGS MODA GROUP, LLC; DIGS MODA GROUP; DIGS MODA SOHO LLC; DIGS MODA SOHO; DIGS MODA.COM LLC; and/or DIGS MODA.COM. It is expressly understood that each of these entities shall survive and be continued without dissolution to do business as the Company deems appropriate with all intellectual property rights and other rights in and to the same being retained by the Company, with only the agreement to cause a name change as set forth in section 1.03.2 below.

87.     The Membership Transfer Agreement (Section § 1.04) further provides that "[a]ll assets and liabilities of the [C]ompany shall remain the same unless specifically altered by this Agreement."

88.     In addition, the Membership Transfer Agreement (Section 1.02.2.2) identified the Plaintiffs' "Trademarks" whose license would expire upon the termination of the Transfer Period:

> Notwithstanding anything in the Operating Agreement to the contrary, the Company's license to use the following Trademarks shall terminate at the end of the "Transition Period" as such term is defined in Section 1.03:  "DIGS", "Royal Digs", "Vintage Digs", "Digs Couture", and "Digs Bijoux". It is expressly understood and agreed among the

parties that the Company may continue to use the aforementioned Trademarks at the store operated by DIGS MODA SOHO LLC and through the Domain Name digsmoda.com until the end of the Transition Period (and as set forth in 1.02.2.6 and 1.03.2).

89.     The Membership Transfer Agreement (Sections 3.01, and 3.02) further provides

for Confidentiality and Non-Disparagement in that, among other things, "The parties … agree to

keep confidential and not disclose to any third party the terms and conditions of this Agreement

… [and] that [e]ach … part[y] … agrees not to make any statements, written or verbal, or cause

or encourage others to make any statements, written or verbal, that defame, disparage, or in any

way criticize the personal or business reputation, practices, or conduct of any party hereto …

[and] … that this prohibition extends to statements, written or verbal, made to anyone, including

but not limited to … competitors, strategic partners, vendors … and former, existing, potential

and future customers."

*Plaintiffs' Post-Membership Transfer Agreement Breaches and Wrongful Conduct*

90.     Despite Defendants spending significant sums of money during and after the

Transition Period to rename each of the defendant entities, launch the Company under its new

brand as Madonna & Co., and redirect the digsmoda.com website to madonnaanco.com (and

branding the website as Madonna & Co.), Plaintiffs made efforts both during and after the

Transition Period to hinder Defendants' rebranding and to otherwise interfere with Defendants'

business.

91.     Notwithstanding that Defendants were permitted during the Transition Period

(i.e., through October 30, 2013) to continue exercising their rights to the license to use the

Trademarks, as early as October 7, 2013, Eva advised third-parties, both orally and in writing,

that the DIGS Soho Store was closed.

92.     For example, on October 7, 2013, Eva wrote the following to Shoptiques, a third-

party promoter with whom the Defendants did and continue to do business:

> Please confirm that you received my email below and please make sure that you remove the DIGS SOHO store off your website today to avoid any trademark infringement. This store is officially closed and Shoptiques cannot use our name without our permission. Geralynn Madonna is no longer affiliated with us or DIGS anymore and cannot be listed as owner on your website for DIGS.

93.    Notwithstanding that Defendants' counsel demanded that the Rajwans retract their false and defamatory statements to Shoptiques.com, the Rajwans failed to do so, and instead have continued to disparage Geralynn and Madonna & Co. and have continued to make false and defamatory statements to third-parties concerning Geralynn and Madonna & Co.

94.    In addition to Eva's October 7, 2013 email to Shoptiques, Eva emailed Geralynn on October 7, 2013, stating: "We are aware there is a transition period till the end of the month … everything that is DIGS related to Soho will be and must be terminated by the close date *even if you don't do it.*" (Emphasis added.)

95.    Eva kept her promise, and despite the explicit language in sections 1.02.2.6, 1.02.2.2 and 1.04 of the Member Transfer Agreement, upon information and belief, Eva and Bhinda have notified numerous third-parties (including but not limited to website hosts and social media companies) that the Company (Digs Moda Soho and/or Madonna & Co.) is closed or otherwise out of business, and/or that it is or has been improperly displaying historical Company information or content.

96.    By way of example, as part of the Membership Transfer Agreement, Defendants changed the name of the Company's Facebook page to Madonna & Co. Only moments following the Transition Period, on November 1, 2013, without notice to Defendants, Eva twice notified Facebook of alleged intellectual property right infringements on the Madonna & Co. page. Facebook responded by removing the allegedly offending items. Again, on November 6, 2013,

without notice to Defendants, Eva sent another similar complaint to Facebook, which resulted in Defendants being locked out of the Madonna & Co. Facebook account.

97.     Eva's complaints to Facebook related to historical photos posted depicting the DIGS Soho Store and other items depicting the Trademarks, all of which were posted prior to the execution of the Membership Transfer Agreement, and, upon information and belief, were identified as to the date of posting.

98.     By letter dated November 18, 2013, Plaintiffs, through counsel, advised Defendants of further complaints concerning the Madonna & Co. Facebook page in addition to other alleged improper activity by Defendants.

99.     By letter dated November 25, 2013, Defendants, through counsel, provided full and complete substantive responses to the allegations set forth in Plaintiffs' November 18, 2013 letter.

100.    Upon information and belief, the Plaintiffs' unilateral action and communication to Facebook, without notice to Defendants, and refusal thereafter to assist Defendants to re-gain access to Facebook, was done with the intent to disrupt the launch of the Company's new Madonna & Co. brand and cause damage to the Company.

101.    Plaintiffs' conduct causing Facebook to prevent Defendants' access to the Madonna & Co. Facebook account significantly damaged and otherwise sabotaged the Madonna & Co. brand launch.

102.    Similarly, Plaintiffs improperly communicated with other third-parties, such as Yelp, Bing, Google, and Yahoo.  Plaintiffs have improperly advised third-parties that the DIGS Soho Store is closed or out of business. Plaintiffs' unilateral actions have caused, and continue to cause Defendants to lose business.

103.    Upon information and belief, Eva and/or Bhinda have posted inappropriate "tweets" on Defendants' Twitter account and/or improperly accessed Defendants' Twitter account.

104.    Upon information and belief, on or about December 27, 2013, the phone number (917) 822-0391, which, belongs to Eva and/or Bhinda, accessed the Madonna & Co. Twitter account and tweeted the following "tweets" while still signed into the account which appeared on the Madonna & Co. twitter feed: "No she's not getting any followers just 1 a month it seems but she did get 3 unfollowers last week. LOL!!"; and "Sending you a pic from bhindas phone".

### *The Company Owns the Mark DIGS Beaute*

105.    In contemplation of and after forming the Company, the Company created a line of cosmetic products that were marketed and sold under the mark DIGS Beaute (the "DIGS Beaute Mark"). The Company commenced using the DIGS Beaute Mark in commerce on or about October 15, 2011 -- more than one month after the Company was formed.

106.    Geralynn was actively involved in the creation of the DIGS Beaute Mark.

107.    The Company developed the DIGS Beaute Mark specifically for the DIGS Soho Store and the new digsmoda.com website.

108.    Nowhere in the definition of Trademarks in the Operating Agreement does "DIGS Beaute" appear.

109.    The mark "DIGS Beaute" is included as Company Intellectual Property as defined in Section 2.8 of the Operating Agreement:

> Notwithstanding the aforementioned Trademarks and Domain Names License, it is expressly agreed and acknowledged by and among the Members and the Company that any newly created Intellectual Property Rights in furtherance of the Company Business, whether a derivative work of the Trademarks and Domain Names or otherwise, shall be the sole property of the Company unless otherwise set forth in a signed writing by and among the Members and the Company.

"Intellectual Property Rights" shall mean all property, intellectual, industrial design and moral rights of every kind and nature, including all applications thereof, including but not limited to patents, copyrights, trademarks, service marks, trade names, trade dress, symbols, logos and designs, trade secrets, and registrations, initial applications, renewals, extensions, continuations, divisions or reissues thereof.

110.    The Operating Agreement defines the Company's Business to include to "expand, develop, and grow the Trademarks and the Domain Names and Product beyond the Existing Store [DIGS]".

111.    When Eva caused an application for the registration of the mark "DIGS Beaute" to be filed with the United States Patent and Trademark Office ("USPTO"), she identified the owner as DIGS rather than the Company.

112.    Because Eva, Bhinda and Geralynn agreed that Eva and Bhinda would assign ownership of "DIGS Beaute" to the Company, notwithstanding that the application was initially filed by DIGS, the Company paid the USPTO application fee for the trademark application for "DIGS Beaute".

113.    Upon information and belief, Eva caused the "DIGS Beaute" mark application to state that DIGS is the owner of it because Eva and Bhinda never intended to honor their agreement to assign the ownership of that mark to the Company.

114.    Upon information and belief, Plaintiffs never assigned DIGS' ownership of the "DIGS Beaute" mark to the Company.

*Plaintiffs Have Wrongfully Used Defendants' Digital Images*

115.    Upon information and belief, when Eva and Bhinda left the Company, they took digital images with them that were created by the Company for use on the digsmoda.com website that Geralynn had developed for the Company.

116.    The Company still maintains the digsmoda.com website which has been

redirected to madonnaandco.com.

117.    Upon information and belief, the digital images that Eva and Bhinda took are Company property pursuant to the terms of the Operating Agreement and the Membership Transfer Agreement.

118.    Defendants never agreed or consented to Plaintiffs' use of the Company's digital images.

119.    Upon information and belief, Plaintiffs have used and currently use the Company's digital images on the Plaintiffs' website (digsny.com), Facebook account, Twitter account, and other promotional and marketing materials.

## FIRST COUNTERCLAIM
### (Breach of Fiduciary Duty Against Eva and Bhinda)

120.    Defendants repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

121.    Eva and Bhinda, as members and managers of the Company, owed fiduciary duties of loyalty, good faith, and due care to the Company and to Geralynn.

122.    Pursuant to their fiduciary duties, Eva and Bhinda, were required to act in the utmost good faith, not to engage in self-dealing, not to conceal information from Geralynn or otherwise mislead Geralynn concerning fundamental issues and the intentions of Eva and Bhinda which were critical to the long term viability of the Company, and not to manipulate the business of the Company in their own interests to the detriment of the Company or Geralynn.

123.    While members and managers of the Company, Eva and Bhinda breached their fiduciary duties to the Company and to Geralynn by, among other things, taking actions which were not made in good faith, were disloyal, and lacked due care.

124.    Eva's and Bhinda's actions were intentional and made for the purpose of

advancing their own best interests individually and their Existing DIGS Store to the exclusion and significant detriment of both the Company and Geralynn, and with conscious disregard for their obligation to protect the Company's business.

125.    Eva and Bhinda breached their respective fiduciary duties to the Company and Geralynn by, among other things:

      a.    Inducing Geralynn to pay to the Company and cause the Company to make payment to Eva and Bhinda in the amount of $40,000 as compensation and $110,000 in loans by misrepresenting that Eva would design clothes for the Company, and that Bhinda would manage the inventory and logistics of the Company, and that they would provide the DIGS NYC LLC email database with 5,000 valid customer email addresses to the Company;

      b.    Failing to disclose to Geralynn and the Company that Eva, Bhinda, and/or DIGS had been sued and/or had judgments against them;

      c.    Refusing to design clothes for the Company at any time, despite Eva and Bhinda's representations that Eva would do so, and Eva's requirement to do so pursuant to the Operating Agreement;

      d.    Refusing to provide the Company with DIGS NYC LLC's email list with approximately 5,000 valid customer email addresses at any time, despite Eva and Bhinda's representations to do so, and their requirement to do so pursuant to the Operating Agreement;

      e.    Refusing to substantively communicate or collaborate with Geralynn regarding Company product offerings or strategies and procedures for growth;

      f.    Inducing Geralynn to refrain from dissolving the Company by continuously

misrepresenting that Eva's outbursts, abusive behavior, and distractions would stop and that they would participate further in the Company;

g.  Stealing product and money from the Company to benefit themselves and their Existing DIGS Store;

h.  Failing to protect the Company from theft and other unnecessary expenses due to lack of care in running administrative and financial operations of the Company in favor of Eva and Bhinda's Existing DIGS Store;

i.  Refusing to associate with the DIGS Soho Store, expending all of their efforts and resources on their Existing DIGS Store; and

j.  Refusing to order merchandise for the Company and cancelling orders for merchandise that Geralynn made for the Company.

126.    Eva's and Bhinda's breaches of their fiduciary duties to the Company and to Geralynn have proximately caused the Company and Geralynn to suffer substantial monetary damages, in an amount to be determined at trial, but in no event less than $550,000, plus interest, punitive damages, costs, disbursements, and incidental or consequential damages.

## SECOND COUNTERCLAIM
### (Fraudulent Inducement Against Eva and Bhinda)

127.    Defendants repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

128.    The oral representations that Eva and Bhinda made to Geralynn in that: (i) Eva would design the majority of clothes for the Company and that the Company would offer unique designs, designed exclusively for the DIGS label (and not merely purchased from wholesalers); (ii) Bhinda would manage the inventory and logistics of the Company with a high degree of skill and attention; (iii) Eva and Bhinda both would devote a substantial amount of their time to the

Company; (iv) the DIGS NYC LLC email list contained approximately 5,000 legitimate customer email which Eva and Bhinda both would contribute to the Company; (v) Eva and Bhinda both would work with Geralynn to implement improvements or new business procedures beyond the simple retail procedures then in place for the Existing DIGS Store; were all false and misleading at the times they were made initially in or about June and July 2011, were false and misleading at the time they were made prior to and upon entering into the Company's Operating agreement; and were all false and misleading when they were repeated and reconfirmed after entering into the Company's Operating Agreement.

129.    Eva and Bhinda each knowingly made the false and misleading representations to: (i) induce Geralynn to enter into the Operating Agreement, provide capitalization to the company in the amount of $40,000, make the Initial Geralynn Loan ($400,000) and the Secondary Geralynn Loan ($110,000) to the Company; and (ii) induce Geralynn to cause the Company, after formation, to authorize compensation to Eva and Bhinda in the amount of $40,000 (from the capital contribution) and make the loan to Eva and Bhinda in the amount of $110,000.

130.    In justifiable reliance on their false and misleading representations, Geralynn became a member of the Company, provided $40,000 capital and $510,000 in loans to the Company; and later after formation caused the Company to authorize compensation to Eva and Bhinda in the amount of $40,000 (from Geralynn's capital contribution) and make the loan to Eva and Bhinda in the amount of $110,000.

131.    Geralynn would not have become a member of the Company, nor made the aforesaid initial capital contribution or the loans to the Company, or after formation of the Company, as a member, would not have caused the Company to authorize compensation to Eva and Bhinda in the amount of $40,000, or make the $110,000 loan had Geralynn known that

49

Eva's and Bhinda's representations were false and misleading.

132.   The oral representations that Eva and/or Bhinda made to Geralynn after September 2011 that: (i) following Eva's uncooperative and abusive behavior in September 2011, Eva would alleviate such behavior; (ii) following Eva's and Bhinda's lack of time commitment to the Company in favor of their time commitment to their Existing DIGS Store, they would commit a substantial amount of time and resources to the Company; (iii) following Eva's and Bhinda's refusal to implement improvements or new business procedures beyond the simple retail procedures then existing for the Existing DIGS Store, that they would discuss doing so with Geralynn; (iii) following Eva's and Bhinda's taking merchandise from the Company for their personal use at their Existing DIGS Store and charging personal and DIGS NYC LLC expenses to the Company, that they did not have money to repay such charges, but would do so as soon as they had the money; were all false and misleading at the times they were made.

133.   Prior to June 2013, Bhinda and Eva knowingly made these false and misleading statements to induce Geralynn to refrain from causing a dissolution of the Company because they wanted to ensure that the Geralynn Secondary Loans that Geralynn made to the Company in the amount of $110,000, which the Company paid directly to Bhinda and Eva (as loans which were forgiven over time, and completely forgiven by April 2013 if the Company was still doing business at that time) would finally be treated as compensation to Eva and Bhinda.  In reliance on the false and misleading representations described above, Geralynn did not cause a dissolution of the Company prior to the time the full amount of the $110,000 loan to Bhinda and Eva was completely forgiven and treated as compensation in or about June 2013.

134.   Geralynn justifiably relied on these misrepresentations and would not have refrained from causing a dissolution of the Company prior to the full amount of the $110,000

loan to Eva and Bhinda being completely forgiven and treated as compensation in or about June 2013 had Geralynn known that Eva's and Bhinda's representations were false and misleading.

135.    As a result of the aforesaid, Geralynn and the Company have suffered significant monetary damages, in an amount to be determined at trial, but in no event less than $550,000, plus interest, punitive damages, costs, disbursements, and incidental or consequential damages.

### THIRD COUNTERCLAIM
**(Breach of the Operating Agreement Against Eva and Bhinda)**

136.    Defendants repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

137.    Under the terms of the Operating Agreement, Plaintiffs agreed that, among other things: (i) Eva would be the "designer" for the Company and design clothes for manufacture and sale; (ii) Bhinda would manage the inventory and logistics of the Company; (iii) Eva and Bhinda both would devote a substantial amount of their time to the Company; (iv) Eva and Bhinda both would provide the email list for DIGS NYC LLC (which they had represented to include over 5,000 valid customer email addresses); (v) Eva and Bhinda both would work with Geralynn to implement improvements or new business procedures beyond the simple retail procedures then existing for the Existing DIGS Store; and (vi) Eva would develop brand/product concepts and establish new ones in partnership with Geralynn.

138.    Geralynn performed all of her obligations under the Operating Agreement, including but not limited to capitalizing the Company with $40,000, providing the Initial Geralynn Loan to the Company ($400,000), and providing the Company with the Secondary Geralynn Loans ($110,000).

139.    Eva and Bhinda materially breached the Operating Agreement by, among other things: (i) Eva's refusal to design clothes for the Company; (ii) Eva's and Bhinda's refusal to

proved the DIGS NYC LLC email customer list which was represented to include 5,000 valid customer email addresses, and instead providing a list of approximately 100 valid email addresses; (iii) Bhinda's failures to protect the Company from theft and other unnecessary expenses due to lack of care in running administrative and financial operations of the Company in favor of Eva and Bhinda's Existing DIGS Store; (iv) Eva's and Bhinda's refusal to commit substantial time to the Company and progressive disassociation from the Company in favor of their significant attention to the Existing DIGS Store; (v) Eva's non-cooperative and abusive behavior, refusal to collaborate with Geralynn, and Bhinda's misrepresentations which where intended to enable Eva's behavior which made the Company non-functional; (vi)  Eva's and Bhinda's pattern of taking merchandise and other products for their own benefit for resale at their Existing DIGS Store and otherwise charging personal expenses or expenses relating to their Existing DIGS Store to the Company without repayment to the Company; (vii) Eva's refusal to order merchandise for the Company in or about July and August 2013 which was intended to harm the cash flow of the Company; and (viii) Eva's cancelling orders, in or about July and August 2013, made by the Company, thereby interfering with the Company's contractual rights with third-parties which actions were intended to harm the cash flow of the Company.

140.    By reason of Eva's and Bhinda's breaches of the Operating Agreement, the Company and Geralynn have suffered, and continue suffer, damages, in an amount to be determined at trial, but in no event less than $550,000, plus interest, costs, disbursements, and incidental or consequential damages.

## FOURTH COUNTERCLAIM
### (Breach of the Membership Transfer Agreement Against Eva and Bhinda)

141.    Defendants repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

142.    Under the terms of the Membership Transfer Agreement, Defendants agreed that the Company (now as Madonna & Co.) would continue to do business as it deems appropriate and continue to use all intellectual property rights and retain all assets it previously had unless explicitly agreed in writing otherwise.

143.    Plaintiffs further agreed to keep the contents of the Membership Transfer Agreement confidential and not to disparage Defendants.

144.    Plaintiffs have materially breached the Membership Transfer Agreement by, among other things, making false and defamatory statements to third-parties, including to Shoptiques.com, Facebook and Yelp concerning Geralynn's ownership of Madonna & Co. and Madonna & Co.'s rights.

145.    Plaintiffs have materially breached the Membership Transfer Agreement by, among other things, accessing and utilizing Madonna & Co.'s Twitter account after Eva and Bhinda were no longer members of the Company, and causing embarrassing and defamatory tweets to appear on Defendants' Twitter feed.

146.    Plaintiffs have materially breached the Membership Transfer Agreement by, among other things, its prior and continued use of Defendants' property, including without limitation the DIGS Beaute Mark, for their own use and benefit in violation of the Membership Transfer Agreement.

147.    Plaintiffs have materially breached the Membership Transfer Agreement by, among other things, their prior and continued use Defendants' property, including without limitation certain digital images owned by Defendants, for their own use and benefit in violation of the Membership Transfer Agreement.

148.   By reason of Plaintiffs' breaches of the Membership Transfer Agreement, Defendants have suffered, and continue suffer, damages, in an amount to be determined at trial, plus interest, costs, disbursements, and incidental or consequential damages.

**FIFTH COUNTERCLAIM**
**(Tortious Interference With Prospective Business Relations Against All Plaintiffs)**

149.   Defendants repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

150.   Eva and Bhinda, on behalf of themselves and DIGS NYC LLC, have made false and/or defamatory statements concerning Geralynn and Madonna & Co. to third-parties, including without limitation to Shoptiques.com, Facebook and Yelp, stating that Geralynn is not an owner of DIGS Soho, that DIGS Soho is closed rather than that it changed names and/or brands, that Madonna & Co. is closed and/or out of business, and that Geralynn and/or Madonna & Co. is violating Plaintiffs' intellectual property rights.

151.   Plaintiffs have acted maliciously and intentionally, with the sole purpose of harming Defendants.

152.   Defendants' actions were wrongful and improper independent of the interference they have caused because, among other things, they have intentionally misrepresented Geralynn's ownership of DIGS Soho, that DIGS Soho is closed rather than that it changed names and/or brands, that Madonna & Co. is out of business, and that Geralynn and/or Madonna & Co. is violating Plaintiffs' intellectual property rights.

153.   As a direct consequence of Plaintiffs' actions, Madonna & Co. has been locked out of certain of its own accounts; has had certain of its Internet business listings and accounts wrongly reflect that it is out of business; and has lost, and continues to lose, customers and relationships.

154.    Plaintiffs' actions have injured Defendants in an amount to be determined at trial, plus interest, costs, disbursements, and incidental or consequential damages.

### SIXTH COUNTERCLAIM
**(Defamation Against All Plaintiffs)**

155.    Defendants repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

156.    On or about October 7, 2013, Eva, on behalf of herself and DIGS NYC LLC, notified Shoptiques.com by email that DIGS Soho is "officially closed and Shoptiques cannot use our name without our permission."  Eva further stated in her email to Shoptiques that "Geralynn Madonna is no longer affiliated with us or DIGS anymore and cannot be listed as owner on your website for DIGS."

157.    Eva intentionally made the foregoing statements to Shoptiques.com, knowing that they were and continue to be false, without privilege or authorization.

158.    Upon information and belief, on or about November 1, 2013, Eva and/or Bhinda, on behalf of themselves and DIGS NYC LLC, notified Facebook by email that Madonna & Co.'s page (which is formerly the DIGS Soho page) contained content that infringes or otherwise violates their rights in connection with an album of photos contained on the page.

159.    Eva and/or Bhinda intentionally made the foregoing statements to Facebook, knowing that they were and continue to be false, without privilege or authorization.

160.    On or about November 7, 2013, Eva and/or Bhinda, on behalf of themselves and DIGS NYC LLC, notified Yelp.com by email that DIGS Soho and/or Madonna & Co. is closed. As a direct consequence of Defendants' actions, Yelp wrongly listed Madonna & Co. as "closed". This lasted for a time until Madonna & Co. was able to rectify the wrongful and defamatory statement.

161.    Eva and/or Bhinda intentionally made the foregoing statements to Yelp, knowing that they were and continue to be false, without privilege or authorization.

162.    Upon information and belief, Eva and/or Bhinda, on behalf of themselves and DIGS NYC LLC, continue to notify other third-parties (websites containing business listings and related information), including but not limited to Yahoo and Bing, that DIGS Soho and/or Madonna & Co. is closed.  As a direct consequence of Plaintiffs' actions, the Madonna & Co. Yahoo account has been caused to contain incorrect information (which has yet to be completely rectified by Yahoo), and the Bing account lists Madonna & Co. as closed and has additionally caused the Bing account to contain incorrect information (which has yet to be rectified by Bing).

163.    Upon information and belief, Eva and/or Bhinda intentionally made the foregoing statements to Yahoo, Bing, and other third-parties, knowing that they were and continue to be false, without privilege or authorization.

164.    Eva's and/or Bhinda's foregoing false statements have injured, and continue to injure, Defendants' reputation and caused, and continue to cause, economic injury to Madonna & Co.'s business, in an amount to be determined at trial, plus interest, costs, disbursements, and incidental or consequential damages.

### SEVENTH COUNTERCLAIM
**(Cancellation of the DIGS Beaute Mark Against All Plaintiffs)**

165.    Defendants repeat and reallege each of the foregoing paragraphs as if fully set forth herein.

166.    Eva and/or Bhinda caused the application for registration with the USPTO to state that DIGS NYC LLC is the owner of the mark DIGS Beaute.

167.    At that time, Eva and/or Bhinda knew that the Company was actually the owner of the mark DIGS Beaute, but they agreed that they would cause DIGS NYC LLC.to assign

ownership to the Company.

168.     Upon information and belief, Eva and Bhinda never informed the USPTO that the Company was actually the owner of the mark DIGS Beaute or that DIGS NYC LLC had agreed to assign the mark DIGS Beaut to the Company.

169.     Upon information and belief, Eva and Bhinda never intended to honor their agreement to assign ownership of the mark DIGS Beaute to the Company.

170.     The information, or lack thereof, that Eva and/or Bhinda provided, or failed to provide, to the USPTO was material to the USPTO's determination to issue the DIGS Beaute federal trademark registration to DIGS NYC LLC.

171.     Upon information and belief, the USPTO reasonably relied on Plaintiffs' omissions of material facts in determining to issue registration of the mark DIGS Beaute to DIGS NYC LLC.

172.      At all times prior to the entering of the Membership Transfer Agreement, the mark DIGS Beaute was used in commerce by Defendants and not by Plaintiffs.. Plaintiffs have thus perpetrated a fraud on the USPTO as to obtaining registration of the mark DIGS Beaute by claiming exclusive rights for goods and services for which it is not entitled.

173.     Defendants have been and continue to be damaged by virtue of Plaintiffs' having fraudulently obtained registration of the mark DIGS Beaute, by, among other things, Plaintiffs' allegations in this litigation that Defendants have improperly used the mark DIGS Beaute, and Plaintiffs' failure to compensate Defendants for use of the mark DIGS Beaute.

## EIGHTH COUNTERCLAIM
### (Permanent Injunction Against All Plaintiffs)

174.     Defendants repeat and reallege each and every of the foregoing paragraphs as if fully set forth herein.

175.    Plaintiffs have made false and/or defamatory statements concerning Geralynn and Madonna & Co. to third-parties, including without limitation to Shoptiques.com, Facebook and Yelp, such as that Geralynn is not an owner of Madonna & Co. or DIGS Soho, that Madonna & Co. or DIGS Soho is closed and/or out of business, and that Madonna & Co. is violating defendants' intellectual property rights, notwithstanding that the Eva and Bhinda explicitly agreed in the Membership Transfer Agreement that DIGS Soho would not be dissolved, that Geralynn would change its name so that it would continue to exist and operate as a retail clothing store, and that the entity would continue to enjoy all of its previously acquired intellectual property rights and retain all assets.

176.    Plaintiffs have unlawfully posted to and/or accessed Defendants' Twitter account and caused embarrassing and defamatory tweets to appear on Defendants' Twitter feed.

177.    Plaintiffs have and continue to use Defendants' property, including without limitation the DIGS Beaute Mark, for their own use and benefit in violation of the Membership Transfer Agreement.

178.     Plaintiffs have and continue to use Defendants' property, including without limitation certain digital images, for their own use and benefit in violation of the Membership Transfer Agreement.

179.    Plaintiffs' actions have caused, and continue to cause, irreparable harm to Defendants, including without limitation damaging Defendants' reputations. Plaintiffs are entitled to a permanent injunction, enjoining and prohibiting Defendants from:  (i) disparaging Geralynn and/or Madonna & Co.; (ii) making false and/or defamatory statements about Geralynn and/or Madonna & Co. to third-parties; (iii) accessing Defendants' Twitter account (or any other internet or social media accounts) for any purpose whatsoever; (iv) using

the DIGS Beaute Mark in commerce; and (v) using the Defendants' digital images.

WHEREFORE, Defendants G.M. Madonna & Co., LLC f/k/a Digs Moda Group, LLC f/k/a Digs Moda LLC; Madonna & Co., LLC f/k/a Digs Moda Soho LLC; and Madonnaandco.com LLC f/k/a Digs Moda.com LLC; and Geralynn Madonna respectfully request that the Court issue a Judgment as follows:

a.  Dismissing the Complaint with prejudice;

b.  Awarding Defendants damages on their first counterclaim in an amount to be determined at trial, but in no event less than $550,000, plus interest, punitive damages, costs, disbursements, and incidental or consequential damages;

c.  Awarding Defendants damages on their second counterclaim in an amount to be determined at trial, but in no event less than $550,000, plus, interest, punitive damages costs, disbursements, and incidental or consequential damages

d.  Awarding Defendants damages on their third counterclaim in an amount to be determined at trial, but in no event less than $550,000, plus interest, costs, disbursements, and incidental or consequential damages;

e.  Awarding Defendants damages on their fourth counterclaim in an amount to be determined at trial, plus interest, costs, disbursements, and incidental or consequential damages;

f.  Awarding Defendants damages on their fifth counterclaim in an amount to be determined at trial, plus interest, costs, disbursements, and incidental or consequential damages;

g.  Awarding Defendants damages on their sixth counterclaim in an amount to be determined at trial, plus interest, costs, disbursements, and incidental or

consequential damages;

h.      On Defendants' seventh counterclaim, canceling Plaintiff DIGS NYC LLC's

registration with the USPTO of the mark DIGS Beaute;

i.      On Defendants' eighth counterclaim, permanently enjoining and prohibiting

Defendants from:  (i) disparaging Geralynn and/or Madonna & Co.; (ii) making

false and/or defamatory statements about Geralynn and/or Madonna & Co. to

third-parties; (iii) accessing Defendants' Twitter account (or any other internet or

social media accounts) for any purpose whatsoever; (iv) using the DIGS Beaute

Mark in commerce; and (v) using the Defendants' digital images;

j.      Awarding Defendants punitive damages;

k.      Awarding such other and further relief against Plaintiffs as the Court may deem

just and proper, including without limitation Defendants' costs, attorney's fees

and disbursements of this action.

## DEMAND FOR JURY TRIAL

Defendants hereby demand a jury trial on all issues which can be heard by a jury.


Dated:  New York, New York
        April 3, 2014

FINKELSTEIN PLATT LLP

By: _____
      Robert F. Finkelstein
      rf@finkelsteinplatt.com
      Christopher J. Platt
      cp@finkelsteinplatt.com

11 Broadway, Suite 615
New York, New York 10004
(212) 422-7446

*Attorneys for Defendants*